## Case No. 14,067.

### TOBEY v. LEONARD et al.

[2 Cliff. 40.] [1]

Circuit Court, D. Massachusetts. Oct., 1861.

PLEADING IN EQUITY—EFFECT OF ALLEGATIONS IN ANSWER—CONTRACT TO CONVEY LAND—EXTRANEOUS EVIDENCE.

1. Where the allegations of the answer are directly responsive to the bill, courts of equity cannot decree against such denials of the respondents, on the testimony of a single witness.

2. The rule is universal that the complainant in such a case must have two witnesses, or one witness and corroborative circumstances, or he is not entitled to relief.

3. The complainant, calling upon the respondent to answer an allegation, admits the answer to be evidence; and if it is testimony, it is equal to the testimony of any other witness.

4. Where the complaining party parts with the title, and it passes from him to the respondent, the rule admitting extraneous evidence to show the real character of the conveyance may apply; but it has no application to a contract to convey land, or to an agreement to give a bond or written instrument to convey the same, in cases where the party to be charged derived his title from a stranger.

[Cited in Clapp v. Huron County Banking Co., 50 Ohio St. 541, 35 N. E. 308.]

5. In a suit to compel performance of an alleged oral agreement to convey lands, not purchased by respondent of the complainant, held, that evidence to show that the complainant or his grantor had a right to redeem certain parcels of the land was inadmissible, under the pleadings, the bill confessedly not being one for redemption.

This was a bill in equity brought to enforce a trust in lands.

Jonathan Tobey, the father of the complain-

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

ant, being the owner of certain real estate situated in New Bedford, and known as his homestead farm, on the 28th of January, 1830, conveyed the same in mortgage to one William Rotch, to secure a debt of $5,000, and being also the owner of certain other real estate in New Bedford and Acushnet, he conveyed this in mortgage, and also the real estate previously mortgaged, to Stephen S. Tobey and his brother Leonard W., to secure an indebtedness of $6,000. Subsequently the brother of the complainant conveyed to him all his interest in the mortgage, and the debt secured thereby. Jonathan Tobey having failed to meet the condition of the mortgage to William Rotch, the mortgagee, on November 28, 1849, entered and took possession of the premises for breach of the condition, and for the purpose of foreclosing. Notwithstanding the foreclosure, the mortgagor continued in the occupancy of the premises as tenant at will of the mortgagee, during his lifetime, and, after his decease, as tenant at will of his legal representatives, until some time during the year 1858 or 1859, when the title having passed out of the mortgagor, by foreclosure, those interested brought ejectment to obtain possession.

The bill alleged that, pending that suit, the owners having expressed a willingness to sell the premises to the defendant in that suit for less than the original mortgage debt, and less than the value, he, the defendant in that suit, applied to the respondent, Horatio Leonard, who had married his daughter, to procure the money for him of his father, Nehemiah Leonard. They proposed to ascertain the lowest price at which the homestead could be purchased, and afterwards informed him that at could be obtained for $2,500, by their giving two notes payable in twelve months, one to be signed by Nehemiah Leonard for $2,200, and the other by Horatio for $300. Certain suggestions were made at the time by Nehemiah Leonard, as to cutting wood from the real estate as a means of paying the notes to be given for the purchase-money. Both the complainant and his father were informed by the parties that the senior Leonard would be unwilling to assist in the matter without other security besides the farm included in the mortgage; that he would require the mortgagor and the complainant to convey all their interest in all their real estate before referred to; and they consented to those terms upon the condition that a bond or written agreement should be given back specifying the terms of the agreement under which the conveyances were executed, and upon the payment of what sum a reconveyance of all the real estate should be made. Deeds of quitclaim were accordingly prepared, conveying to Horatio all the interest which the grantors had in all the beforementioned real estate, and the same were duly executed and handed to the grantee, with the expectation, on the part of both grantors, that the agreement to reconvey all said real estate upon the payment of the $2,500, &c., would be given when Horatio or Nehemiah obtained a deed of the homestead. As additional security, and at the request of Horatio, Jonathan Tobey afterwards gave him a bill of sale of all his stock and farming utensils, and carriages, and on March 3, 1860, Nehemiah and Horatio purchased the farm included in the mortgage to William Rotch, by giving their notes in the amount and for the time before stated, and the farm was conveyed to Horatio, who, on June 12, 1860, conveyed the same to Nehemiah. Further, the complainant averred that neither he nor the said Jonathan could obtain from the said Nehemiah any agreement in writing showing how he held the real estate, and that, upon application to him for that purpose, his answer was that when the notes were paid he would make it all right; that in July, 1860, he purchased of the said Jonathan, by deed and bill of sale, all the real estate before referred to, and all his right to have the same conveyed to him, under the agreement, together with all his interest in the stock, farming utensils, &c., for $5,500, and on August 2d he tendered to said Nehemiah the sum of $2,640, and to said Horatio $370, being the respective amounts of their notes and interest, and a reasonable sum to each for their time, and requested Nehemiah to convey to him, the complainant, all the aforesaid real estate, and requested them, or such one of them as had the title under the bill of sale, to convey the stock, farming utensils, and carriages, but each of them refused so to do. Fraudulent combination to deprive him of his rights was then charged upon information and belief. The bill further set up that said Nehemiah alleged that he had conveyed the real estate to Rodolphus and John Ashley, and they to Henry Spooner and Joshua B. Ashley, but that the grantees had at the time knowledge of the complainant's rights and claim; that the conveyance made by him and his grantor to Horatio and Nehemiah were without consideration, and were made solely to secure the notes given for the purchase of the farm; and that the understanding was that the complainant and his grantor should remain in possession, and that the cutting of wood to raise money to meet the notes should be done by him and the complainant, and that they had accordingly remained in possession. The bill prayed for a decree that respondent should convey the real estate, stock, &c., to complainant, upon the performance by the complainant of what devolved upon him under the agreement, for compensation for waste, and for an injunction.

S. Bartlett and D. Thaxter, for complainant.

It is true that when the defendant, in express terms, upon his own knowledge, nega-

tives the allegations in the bill, the oath of one witness is not sufficient to control such denial. But the oath of one witness when supported by any corroborative circumstances which give a preponderance in his favor is sufficient; and the preponderance in this case is overwhelming. 2 Daniell, Ch. Prac. (Perkins' Am. Ed.) 985; Adams, Eq. 145; 1 Greenl. Ev. § 260. The defendants also set up as a bar to this suit the statute of frauds, and alleged that the complainant cannot prevail, because neither the agreement for which the suit is brought, nor any memorandum or note of it, is in writing, signed by the party to be charged therewith. The decisions of this circuit and of the supreme court clearly take this case out of the operation of the statute, and the question raised can no longer be considered an open one. Jenkins v. Eldredge [Case No. 7,266]; Babcock v. Wyman, 19 How. [60 U. S.] 289; Russell v. Southard, 12 How. [53 U. S.] 139; Morris v. Nixon, 1 How. [42 U. S.] 126; Taylor v. Luther [Case No. 13,796]. The doctrine that part performance will take a case out of the statute of frauds is well settled and recognized everywhere. 2 Story, Eq. Jur. §§ 759–761, 1522.

The next question is, are John S. and Rodolphus Ashley bona fide purchasers, without notice, within the principles of a court of equity? It is a well-settled rule that whatever is sufficient to put a party on inquiry is good notice. Where a man has sufficient information to lead him to a fact, he is put upon inquiry, and shall be deemed cognizant of it. Pritchard v. Brown, 4 N. H. 397, 404, 405; Flagg v. Mann [Case No. 4,847]; Carr v. Hilton [Id. 2,437].

B. F. Thomas and R. Olney, for respondents.

Did the whole estate owned by Jonathan Tobey in 1830 pass under the mortgage to Rotch? Melvin v. Proprietors of the Locks & Canals on Merrimack River, 5 Metc. [Mass.] 15, 29, 30; Thatcher v. Howland, 2 Metc. [Mass.] 41, 44, note; Wheeler v. Randall, 6 Metc. [Mass.] 529; Shep. Touch. 78, 93; 3 Greenl. Cruise, 267, 269–271. See Kendall v. Brown, 7 Gray, 210; Johnson v. Simpson, 36 N. H. 91. The land involved in this suit lying in Massachusetts, the title to it can be acquired and lost only in the manner prescribed by the law of the place where the land is situate. U. S. v. Crosby, 7 Cranch [11 U. S.] 115; Kerr v. Moon, 9 Wheat. [22 U. S.] 565; M'Cormick v. Sullivant, 10 Wheat. [23 U. S.] 192; Darby v. Mayer, Id. 465; Hosford v. Nichols. 1 Paige, 220; Story, Confl. Laws, §§ 363–373. 424, et seq.; Cutter v. Davenport, 1 Pick. 81; Wheat. Int. Law, 116; Jeter v. Fellowes, 32 Pa. St. 465; Nicholson v. Leavitt, 4 Sandf. 252, 276. And by the General Statutes of Massachusetts (chapter 100, § 20): "No such trust (i. e. concerning lands), whether implied by law or created or declared by the parties, shall defeat the title of a purchaser for a valuable consideration, and without notice of the trust; nor prevent a creditor, who has no notice of the trust, from attaching the premises, or taking them on execution, in like manner as if no such trust had existed." The "notice" required under this section of the General Statutes, to defeat a purchaser's title, is actual notice, because the following section (section 21) declares that the recording of an instrument of trust in the registry of deeds for the county "shall be deemed equivalent to actual notice," &c. It cannot reasonably be supposed that the registration authorized in section twenty-one was meant to be equivalent to anything but the same notice required in section twenty; i. e. "actual notice." The two sections are to be construed together; and as to the meaning of the word "notice," employed in section twenty, section twenty-one operates by way of limitation and definition. If by "notice" in section twenty had been intended both actual and constructive notice, there would have been no propriety in subsequently enacting that one form of constructive notice (namely, registration) should be equivalent to actual notice, when all constructive notice was so equivalent. But, in Massachusetts, it has always been the law, independently of any express statute provision, that a recorded deed could be affected or defeated by a prior unrecorded deed, only when the subsequent grantee has actual notice of the prior conveyance; and that mere possession or other constructive notice will not produce that result. Norcross v. Widgery, 2 Mass. 509; M'Mechan v. Griffing, 3 Pick. 149; Lawrence v. Stratton, 6 Cush. 163, 167; Hennessey v. Andrews, Id. 170; Houghton v. Bartholomew, 10 Metc. [Mass.] 138; Curtis v. Mundy, 3 Metc. [Mass.] 405.

Any other construction of these sections than that contended for would produce the anomalous result of placing executory contracts, resulting in mere equities, on a better footing than those rights or estates which have been perfected with all the forms and solemnities known to the common law; and would give the holder of an equitable mortgage, or of an equity growing out of a contract of sale, and not recorded, a superiority over subsequent creditors and purchasers, which would be denied to a mortgage or a sale consummated by a conveyance. unless placed on record. Possession will not operate as notice if explained, and if it is fully shown by the accompanying circumstances, or otherwise, to be consistent with the conveyance which is assumed to be made; and, in this case, the continued occupation of the estate by the Tobeys could not operate as notice, because entirely explained by the attendant circumstances. Rogers v. Jones, 8 N. H. 264; Williamson v. Brown, 15 N. Y. 354; Cunningham v. Buckingham, 1 Ohio, 264; Cook v. Travis, 22 Barb. 338, 359–361; Butler v. Stevens, 26 Me. 484; Bell v. Twilight, 22 N. H. 500; Billington v. Welsh, 5 Bin. 132; Flagg v. Mann [supra]; M'Mechan v.

Griffing, 3 Pick. 149; Hewes v. Wiswell, 8 Me. 94; Holmes v. Stout, 2 Stockt. Ch. [10 N. J. Eq.] 419; Nutting v. Herbert, 37 N. H. 346. The quitclaim deeds of the two Tobeys having been put on record, they are estopped from relying upon any mere continuance in possession as notice of any remaining rights or equities in themselves. Nehemiah Leonard and the other defendants were not bound to go beyond these publicly recorded declarations. They had a right to presume the Tobeys' possession to be consistent with their conveyances, and that they were mere tenants at will or by sufferance to their grantee, Horatio Leonard. Scott v. Gallagher. 14 Serg. & R. 333; Woods v. Farmere, 7 Watts, 382; Newhall v. Pierce, 5 Pick. 450; New York Life Ins. & Trust Co. v. Cutler, 3 Sandf. Ch. 176. See White v. Wakefield, 7 Sim. 401; Bayley v. Greenleaf, 7 Wheat. [20 U. S.] 46, 51; Plumer v. Robertson, 6 Serg. & R. 179; Cook v. Travis, 22 Barb. 338, 359–361.

As to constructive notice to Nehemiah Leonard of the Tobeys' rights (if it shall be held that any constructive notice would avail), it is manifest, that, to charge Nehemiah Leonard with constructive notice, is at variance with the whole theory of the complainant's case, with the allegations of the bill, and the testimony of Jonathan Tobey. But further, constructive notice of any right of redeeming the farm in either of the Tobeys can be fixed upon Nehemiah Leonard only upon the ground of continued possession of the Tobeys, or of their complaints against Horatio Leonard, made after his purchase, and communicated to Nehemiah. These complaints, however, cannot operate as constructive notice to Nehemiah Leonard, because it is shown by evidence reliable and not contradicted, that he once investigated them, went to see Jonathan Tobey on account of them, and learned from him that the sole cause of the complaints was Horatio's mode of disposing of the wood. Holmes v. Stout, 2 Stockt. Ch. [10 N. J. Eq.] 419. Moreover, Horatio Leonard had also given him the most positive assurances that the Tobeys had not asked, nor had he promised, any sort of right or interest in the farm to the Tobeys, or either of them. Jones v. Smith, 1 Hare, 43; Buttrick v. Holden, 13 Metc. [Mass.] 355; Rogers v. Jones, 8 N. H. 264. Nehemiah Leonard paid the price for the farm simultaneously with its being conveyed to him. By force of the agreement indorsed on the schedule of debts, as well as by the agreement with the creditors, he immediately became bound to the specified creditors of Horatio Leonard to the amount of their respective claims. He thereby appropriated the purchase-money beyond the power of revocation; and so pledged himself in respect of it to third parties, that he could not resist paying it to them upon their demand. Frost v. Beekman, 1 Johns. Ch. 288; Jewett v. Palmer. 7 Johns. Ch. 65. See Gilday v. Watson, 5 Serg. & R. 267; Boggs

v. Varner, 6 Watts & S. 469; Ward v. Lewis, 4 Pick. 518; Bryant v. Russell, 23 Pick. 508; Carnegie v. Morrison, 2 Metc. [Mass.] 381; Frost v. Gage, 1 Allen, 262. If Nehemiah Leonard had no notice of the trust, then the Ashleys. his grantees, cannot be affected by it. Lowther v. Carlton, 2 Atk. 242; M'Queen v. Farquhar, 11 Ves. 467, 478; Trull v. Bigelow, 16 Mass. 406; Boynton v. Rees, 8 Pick. 329; Mott v. Clark, 9 Barr [9 Pa. St.] 399; Lacy v. Wilson, 4 Munf. 313. And they did not make their purchase without diligent inquiry, in the usual course, as to the state of the title, and not till after consultation with counsel. See Jackson v. Van Valkenburgh, 8 Cow. 260; Bellas v. M'Carty, 10 Watts. 26; Wilson v. McCullough, 23 Pa. St. 440; Barnhart v. Greenshields, 28 Eng. Law & Eq. 77, 85; Jolland v. Stainbridge, 3 Ves. 478; Butler v. Stevens, 26 Me. 484; Kerns v. Swope, 2 Watts, 78; Epley v. Witherow, 7 Watts. 163, 167; Woods v. Farmere, Id. 382, 387.

The agreement set out in the complainant's bill is within the statute of frauds of Massachusetts, and within the statute regulating the creation of trusts. Gen. St. c. 105, § 1; Id., c. 100, § 19; Boyd v. Stone, 11 Mass. 342. By the law of Massachusetts, we respectfully submit, since these lands lie in Massachusetts, this cause must be determined. The contract sought to be enforced by the bill is within the letter, and within the reason and sound policy, of the statute of frauds,—a statute whose provisions bind courts of equity equally with courts of law. The case, as stated in the bill, does not fall within the cases cited. The most important are Babcock v. Wyman, 19 How. [60 U. S.] 289; Jenkins v. Eldredge [Case No. 7,266]; Taylor v. Luther [Id. 13,796].

CLIFFORD, Circuit Justice. Some care is required in the examination of the allegations, setting forth the supposed grievances of the complainant, in order clearly and fully to understand the real nature of the claim presented in the bill of complaint. Confessedly it is not a bill to redeem, as is manifest from a single reading; and no pretence of the kind was set up at the argument. Neither the complainant nor his grantor had any interest. absolute or defeasable, in the homestead farm, at the time the same was purchased by Horatio Leonard of the legal representatives of William Rotch. Nothing of the kind is pretended; and, if the pretence were made, it could not be supported for a moment. as the bill of complaint alleges. and the whole evidence shows, that the title had then passed out of the mortgagor by foreclosure. Foreclosure of that mortgage gave the mortgagee a perfect title in fee-simple absolute, as it was prior in date to the one given to the complainant and his brother. Title to the homestead farm, therefore, was acquired by the respondent from those who owned the land

in fee-simple; and no interest therein, either absolute, equitable, or contingent, belonging to the complainant or his grantor, passed to the said respondent by virtue of that deed. The right of redemption in the mortgagor under the mortgage to William Rotch was gone, and the title had become absolute in the legal representatives of the mortgagee. The former ownership, under the circumstances, really amounts to nothing; but the case must be considered precisely as it would be if the mortgagor had never owned the premises. All the negotiations for the purchase were made by the respondent, who became the grantee in the deed, and he secured the consideration by giving his own note and that of his father; and he has since paid the amount of the consideration, without resort to any funds derived from the complainant or his grantor. They furnished no funds to make the purchase, and it is not alleged in the bill of complaint that the grantee in the deed agreed to purchase the land in any other name than his own. Looking at the case, therefore, as stated in the bill of complaint, it is obvious that the grantee in that deed took a title in fee-simple, subject to the legal and equitable operation of the alleged oral agreement to convey the land to the complainant and his grantor upon the terms and conditions therein prescribed. Keeping these explanations in view, the next important consideration is to observe the exact terms of agreement upon which, so far as respects the homestead farm, the rights of the complainant and his grantor depend, as alleged in the bill of complaint. The terms of the agreement were, "that a bond or written agreement should be given back, specifying the terms of the agreement under which the conveyances were executed, and upon the payment of what sum a reconveyance of all the real estate should be made." Taking the language of the bill of complaint which precedes the statement of the agreement in connection with what follows, and it is evident that the complainant intends to allege, and does, in fact, allege, that, according to his understanding of the agreement and that of his grantor, the conveyance back to them was to be made upon the payment of the notes given for the purchase-money and interest, and a reasonable sum for the services of the purchaser. Clearly, therefore, the case stated in the bill of complaint is, that one or both of the principal respondents agreed to purchase certain lands of a third person, and to give to the complainant and his grantor a bond or written agreement to convey the same to them, upon the payment of certain sums of money; and that they have refused to execute and deliver the bond or written agreement, or to convey the land. Confining attention to the claim for the homestead farm, and leaving out of view for the present the claim that two parcels of land were embraced in the quitclaim deeds which do not belong to

the homestead, the explanations already given show the true and exact nature of the controversy involved in this suit, which may be reduced to a single proposition. Complainant alleges, that one or both of the principal respondents, prior to the 3d of March, 1860, or on that day, agreed with him and his grantor to purchase a certain tract of land, described as the homestead farm of his grantor, and to give back to them a bond or written agreement to convey the same to them, upon the payment of the purchase-money and interest, and a reasonable compensation for their services, and that they have refused to give back the bond or written agreement, or convey the land, although they have purchased the land; and the complainant and his grantor have tendered the money according to the agreement, and are in no way delinquent in regard to the same. Denial is made by the respondents of every branch of the proposition; and they insist that, if it were fully proved, it would not entitle the complainant to relief under the prayers set forth in the bill of complaint. Matters of fact, under the circumstances, must first be considered; for, unless the complainant has proved the material allegations of his bill of complaint, he cannot be entitled to relief. Separate answers are filed by the respondents; and, upon an examination of the allegations, it appears that those filed by the two principal respondents are directly responsive to every material allegation in the bill of complaint. Take, for example, the answer filed by the respondent who purchased the homestead, which is the branch of the controversy under consideration. Responding directly to the allegations of the bill of complaint, he expressly denies the whole foundation of the complainant's claim. He denies, among other things, that the owners of the homestead farm ever expressed a willingness to sell the same to the complainant or his grantor for a sum less than the mortgage debt, or less than its value; or that the complainant or his grantor ever applied to him to procure money for them from his father to purchase the farm, or for any purpose; or that he and his father, or either of them, ever engaged to ascertain for them the lowest price at which the farm could be purchased, or to make any inquiries upon the subject for their benefit; or that they, or either of them, ever informed those parties that they could or would purchase the premises on their account or to their use; or that any such suggestion as is alleged, as to cutting wood as a means of raising money to pay the notes, was ever made by them, or either of them; or that they, or either of them, ever promised or suggested that his father would be unwilling to assist them, without such further security as is alleged in the bill of complaint; or that the complainant or his grantor ever, in any way or at any time, ever said or suggested that any bond or written instrument of any kind

whatsoever should be given back, stating or suggesting that a reconveyance should ever be made of the premises; and he expressly alleges that no bond, or other written instrument or writing for a conveyance or reconveyance, was ever named or suggested to him, except as made in the bill of complaint. Equally explicit, also, are the denials in the answer of the other principal respondent. Such denials, to the extent that they relate to facts within the knowledge of the respondent, and are responsive to the allegations in the bill of complaint, must be received as evidence. Courts of equity cannot decree against such denials, in the answer of the respondent, on the testimony of a single witness. On the contrary, the rule is universal, that, under such circumstances, the complainant must have two witnesses, or one witness and corroborative circumstances, or he is not entitled to relief. That rule stands upon the reason, that, when the complainant calls upon the respondent to answer an allegation, he admits the answer to be evidence; and, if it is testimony in the case, it is equal to the testimony of any other witness; and, as the complainant cannot prevail if the balance of proof be not in his favor, he must have circumstances in addition to his single witness, in order to turn the balance. Clarke's Ex'r v. Van Riemsdyk, 9 Cranch [13 U. S.] 160; Hughes v. Blake, 6 Wheat. [19 U. S.] 468.

Much reliance is placed by the complainant upon the testimony of his father, who is his grantor of one half the interest claimed, as before explained. His testimony respecting the circumstances attending the purchase of the homestead farm from the heirs of William Rotch is very explicit, and is given at great length. He states, that he learned from Horatio Leonard and his father, during the pendency of the ejectment suit, that the heirs would sell the property for $2,500; that he and the complainant applied to his son-in-law to help them to the money; but he said he would not, unless his father would assist. Whereupon, the witness states, he applied to the father, and that he agreed to grant the assistance, if the heirs would take his notes on twelve months, and the witness and the complainant would pay them when they fell due; that he agreed to those terms. Speaking of the conversation, the witness states that it took place at the house of his son-in-law; that he and the father of his son-in-law were alone. "Nobody else (was) in the room, and the door was shut." When he went away he remarked, that if the heirs would accept $2,500, and take his notes, and if the complainant and the witness would take care of the notes, he would give them, but that he must be secured on the land. His son-in-law came to him that evening, and told him that he and his father had had a conversation with one of the heirs upon the subject, and that it was agreed that his father should give his note for $2,200, and

that he, the son-in-law, should give his note for $300, both payable in twelve months; and that the heirs should give a bond for a deed of quitclaim, on the payment of the notes. Confirmatory circumstances are then stated by the witness, corresponding substantially with the allegations in the bill of complaint; and, after concluding that relation, he adds that his son-in-law came back alone from the visit to the heirs, and gave him the information before stated, and said, that he would have the papers made all right, including a statement of what the agreement was between the witness and the father of his son-in-law. Directions, however, were given by the witness, to his son-in-law, to go to the office of his attorney, who had charge of the ejectment suit, and have the papers prepared; and in a day or two, at the request of his son-in-law, he went to the office of his attorney, and signed a deed, without reading it, or knowing what was in it, and went out, leaving the complainant there with his son-in-law and his attorney. In answer to another interrogatory, he states that it was agreed between him and Nehemiah Leonard, at the interview between them, in the house of his son-in-law, that he was to have a writing, to show what the understanding was; and he states that the same thing was talked over between him and Nehemiah and Horatio together that same afternoon, and it was agreed that he should have such a writing. Particular mention is also made of a conversation between the complainant and Nehemiah Leonard, in which he states in substance and effect, that the respondent said that all he wanted was the money to meet the notes, and that he took hold of the transaction to help the complainant. Several other conversations with one or the other or both of these respondents are given by the witness, in which, as he states, they substantially admitted that he was to have the agreement for a conveyance. On cross-examination, he admitted that he suggested to the complainant to buy out the farm, and take the fight with the Leonards; and that he stated to him, at the same time, that he should be a witness for him, if he brought a suit. Circumstances of a confirmatory character are also adduced by the complainant; and they were earnestly urged upon the consideration of the court at the argument, and will be briefly noticed at the present time. Reference is made to the bill of sale of the personal property; but there is no evidence to show a delivery, or that one article of it ever went into the possession of the grantee; and the clear inference from the case is, that it was made for some other purpose. Certain witnesses also testify to various conversations with one or the other of the principal respondents; but there is not one of the conversations that has much tendency to prove the alleged agreement to give the bond or other written instrument, or which may not reasonably be explained as consistent

with the truth of the answers. Special reference is also made to the details of the arrangement, as set forth in the bill of complaint; but all those matters must be weighed in connection with the circumstances which existed at the time the arrangement was made. The title in the homestead had become absolute in the heirs of the mortgagee, and all hope of being permitted to remain longer in possession was gone. His sons could do nothing, and he was destitute of means to do anything himself. Unless something was done, the homestead farm must pass into the possession of strangers. One resort only remained, and that was to appeal to his son-in-law; and he accordingly went to his house to make that appeal. But the son-in-law could not furnish the means unless his father would render him assistance. Difficulties arose and objections were made in regard to the confusion in the title papers. All had full confidence in the attorney who had charge of the ejectment suit, and application was made to him for advice and assistance in that behalf. Accordingly, he prepared the title papers, and they were all executed in his presence. Under these circumstances the evidence offered by the complainant is hardly sufficient to prove his case, even when unopposed by that offered by the respondents. Much testimony, however, has been offered by the respondents, and the complainant's testimony must be weighed in connection with all that is of a contradictory character. Great reliance is placed by the complainant upon the testimony of his grantor, to overcome the allegations of the answers; but the testimony of that witness is subject to observations. More than twenty witnesses have been examined to impeach his character for truth and veracity; and although a greater number even have been called to support his character, still the affirmative statements of the first class do impair his credit. His own statement also, that he advised the complainant to purchase his interest and take the fight with the respondents, accompanied as it was with the remark, that he should be a witness if a suit was brought, adds something to the distrust created by the testimony of those witnesses. Nothing can be more explicit than is the denial, in the answers of the respondents, of every material allegation in the bill of complaint; and those denials are strongly confirmed by the statements and acts of the complainant and his grantor during the negotiations for the purchase of the farm, and before and after the conveyances were made. Strong confirmation of the truth of the answers is also derived from the statements of the complainant's grantor, made pending the negotiations, and during his visit to the family of his son-in-law. Those statements are fully proved, not only by three of the children of his son-in-law, but by two or three persons who were residing in the family. Subsequent acts and declarations of the same party are also introduced, which go very far to show that there was no such understanding as is alleged in the bill of complaint. The respondents also examined Thomas M. Stetson, the attorney, who had charge of the ejectment suit, and who prepared the conveyances between the parties. His testimony shows that he advised the defendant in that suit, that he had no defence; that he suggested to Horatio Leonard to buy the farm; that he was not willing to buy a part, unless he could have the whole; that he objected to making the purchase, on account of the confusion in the title papers and of the litigious spirit of the defendant in that suit; that the defendant urged the purchase upon his son-in-law, in order that the property might remain in the family; that the writing, consenting to judgment in that suit and the quitclaims, were executed at the same time, in his office, in the presence of the complainant and his grantor; that the quitclaims were given at the recommendation of the attorney, not to pass any valuable interest, but merely to make a clear and unquestionable title; and that nothing was said about any right of redemption in the complainant or his grantor, or any reconveyance from the grantee. Suffice it to say, without entering more into the details of the evidence, that I am of the opinion that the complainant has failed to prove the agreement set forth in the bill of complaint.

But suppose it were otherwise, and it were fully proved that Horatio Leonard, before and at the time he purchased the farm of the heirs of William Rotch, made the agreement set forth in the bill of complaint; still it is insisted by the respondents that the complainant cannot prevail, because neither the agreement, which constitutes the foundation of the suit, nor any memorandum or note of it is in writing, signed by the party to be charged therewith. Gen. St. p. 527, c. 105, § 1; Id. p. 502, c. 100, § 19; Boyd v. Stone, 11 Mass. 342. They insist that the statute extends to any agreement by which rights already acquired in real estate, under a deed, are enlarged or qualified; that not only is an agreement to execute a mortgage invalid, without writing, but also that an agreement to make a defeasance to an absolute conveyance, or to convert a written mortgage into a conditional sale, or to foreclose a mortgage, even when the agreement is made by solicitors, in anticipation of a decree of court to the same effect, are also invalid, unless the promise, contract, or agreement upon which such action is brought, or some memorandum or note thereof, is in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized. Gen. St. 527; Browne, St. Frauds, p. 272, § 267. On the other hand, it is assumed by the complainant, that the decisions of the supreme court and of this circuit clearly take this case out of the operation of

the statute, and so clearly so, that the case can no longer be regarded an open one. To support that proposition, they refer to the following cases, and insist that they are decisive of the point: Jenkins v. Eldredge [Case No. 7,266]; Babcock v. Wyman, 19 How. [60 U. S.] 289; Russell v. Southard, 12 How. [53 U. S.] 139; Morris v. Nixon, 1 How. [42 U. S.] 126; Taylor v. Luther [Case No. 13,796]. After a careful examination of those cases, I am of the opinion that they do not control the question involved in this case. Take, for example, the case of Russell v. Southard [supra], and the only point decided is, that when the question before a court of equity is whether a deed, which purports upon its face to be an absolute deed, was in reality a deed or mortgage, extraneous evidence is admissible to show that it is only a mortgage. Subsequently, when the question was again presented in Babcock v. Wyman [supra], a majority of the court adhered to the same rule. No such question, however, is presented in this case, as fully appears from the explanations already given. Suppose the rule to be a sound one; still it has no application to this case. Where the complaining party parts with the title, and it passes from him to the respondent, that rule may be applied; but it has no application to a contract to convey land, or to an agreement to give a bond or written instrument to convey the same, in cases where the party to be charged derived his title from a stranger. Browne, St. Frauds, p. 272, § 266; Ledford v. Ferrell's Adm'r, 12 Ired. 285; Clabaugh v. Byerly, 7 Gill, 354; Boyd v. Stone, 11 Mass. 342; Woods v. Wallace, 22 Pa. St. 171; Cox v. Peele, 2 Brown, Ch. 267. Judge Story pressed the exception to the rule to the utmost verge in Jenkins v. Eldredge [supra], but he by no means went far enough to bring this case within the operation of the principle which he there adopted. Agency is not proved in this case, and it cannot be regarded as a case of resulting trust. Proof of fraud also is wanting; and there is no just pretence of part performance, unless it be assumed that the purchase of land by one party is a part performance of an agreement made by him to convey the land to another; which cannot be admitted. None of the elements, therefore, which Judge Story found it necessary to combine, to support the decree in Jenkins v. Eldredge, are to be found in this case.

Some of the evidence introduced to prove the oral agreement set forth in the bill of complaint has some tendency also to show that the complainant or his grantor may have a right to redeem the parcels of land, if any, included in the quitclaim deeds which were not embraced in the mortgage to William Rotch. Should that suggestion be made, the answer to it is, that the bill of complaint is not one for redemption. Suit was brought upon the alleged oral agreement to give a bond or other written instrument, to convey upon certain conditions, and not for the redemption of those lands. Evidence was taken by both parties, in respect to the allegations in the bill of complaint; and the tender and demand made by the complainant had respect to the same matter of controversy. In view of the whole case, I am of the opinion that the complainant, upon the proofs exhibited, has shown no ground for relief; and the bill of complaint is accordingly dismissed with costs.

[Upon an appeal to the supreme court the cause was remanded by that court to the circuit court for further proceedings. 2 Wall. (69 U. S.) 423.]