GEORGE S. GOOD & CO. vs CENTRAL COAL & COKE CO.

Opinion rendered Sept. 26, 1907.

(104 S. W. Rep. 613).

1. *Writ of Error—Law of Case.*
>    The law of a case on a retrial consists of the decision on a previous writ of error, if the evidence is practically the same.

2. *Payment to Wrong Person.*
>    Plaintiff contracted to sell and deliver to defendant certain lumber and piling at stipulated prices and then sublet the contract to A. A filled the order and delivered directly to the defendant who received and used same in the construction of a railroad. When defendant accepted the piling it notified plaintiff that sam was wa

accepted as the property of A. but it would not accept it as the property of the plaintiff. After being notified by both plaintiff and A., defendant paid A's receiver. It is held that such pay-- ment is not satisfaction of the claim of plaintiff against defendant.

3. *Parol Evidence—Scope.*
   Where the agreement attacked is between strangers to the parties to the suit the rule that parol evidence is not admissible to vary the terms of a written contract does not apply.

Error to the United States Court for the Central District of the Indian Territory; before Justice W. H. H. Clayton, February 4, 1905.

Action by the Central Coal & Coke Company against George S. Good & Co. From a judgment for plaintiff, defendant brings error. Affirmed.

The original complaint in this cause was filed on the 13th day of October, 1895, at South McAlester. On April 29, 1896, the defendants, George S. Good & Co., filed their answer to the complaint. On June 30, 1898, the plaintiff filed its amended complaint, and on the same day the defendant filed its amended answer, a jury was impaneled, and the case proceeded to trial. The plaintiff in its amended complaint alleged that on the 15th, day of December, A. D. 1894, plaintiff and defendants entered into a written contract, in which it was agreed that plaintiff should furnish defendants lumber and piling to be used in the construction of the line of the Choctaw, Oklahoma & Gu f Railroad, and that said defendants should pay plaintiff for such lumber and piling as follows: For all lumber delivered f. o. b. South McAlester, Ind. Ter., $13.50 per 1000 feet board measure; for all lumber delivered f. o. b. Oklahoma City, Okl. Ter., $15.50 per 1000 feet board measure; for all piles delivered f. o. b. South McAlester, Ind. Ter., 12½ cents per lineal foot; for all piles delivered f. o. b. Oklahoma City, Okl. Ter., 16 cents per lineal foot. Plaintiff alleged that in all things it

had compied with said contract, and furnished to defendants a large amount of lumber and piling, a statement of which is attached to said complaint, marked "Exhibit B;" that defendants accepted and used the same, but have failed and refused to pay for same, and still refuse so to do, although the same is long past due; that there is due plaintiff from defendants for lumber and piling so furnished the sum of $9,024.42, together with interest at the rate of 6 per cent. from the 20th day of September, 1895, and asks judgment for the same. For a second cause of action, plaintiff alleges that at the instance and request of defendants it furnished and delivered to defendants upon said line of the Choctaw, Oklahoma & Gulf Railroad Company piling as follows, to wit: On May 20, 1895, 12,957 feet; on July 30, 1895, 2,044 feet; on September 30, 1895, 24,177 feet—that said piling so furnished and delivered at the time of its delivery was reasonably worth the sum of 16 cents per foot, making a total value of $6,268.48. Said piling is a part of and included in the account referred to in the foregoing count, which is marked "Exhibit B," and that defendants have refused to pay for the same; and ask judgment for $6,268.48 as the reasonable value of said piling, with interest at 6 per cent. per annum from the 20th day of September, 1895. Defendants, in their amended answer, first deny each and every allegation in the amended complaint filed, and demand strict proof of same; but defendants admit that they owe the plaintiff the sum of $1,201.04. Defendants further say that they ought not to be held to pay plaintiff any further sum of money, because they have paid M. W. Osborn the very sum of money which the plaintiff sues for in this case, and the same was paid to the said Osborn under and by virtue of a certain contract entered into between the defendants and the said Osborn on the 7th day of December, 1894. Second, the defendants by counterclaim asked damages in the sum of $10,000. Thereupon the plaintiff filed its reply

to paragraph 2 of said amended answer, and denies all damages alleged by defendants. Thereupon the case was tried by a jury, and on July 2, 1898, the jury returned a verdict for plaintiff in the sum of $1,201.04. On August 30, 1898, motion for new trial was presented and overruled by the court, and plaintiff appealed to this court. On October 5, 1901, the judgment in this case in the court below was affirmed by this court, and the plaintiff appealed to the United States Circuit Court of Appeals for the Eighth Circuit, and on April 21, 1903, there was filed with the clerk of this court the mandate of the United States Circuit Court of Appeals for the Eighth Circuit, reversing the judgment of the United States Court for the Central District of Indian Territory, and ordering a new trial therein in said cause. On June 24, 1903, the court below ordered that the venue herein, by agreement of parties, be changed to the Poteau division, and on August 24, 1903, a transcript and all original papers were filed at Poteau, and said cause duly docketed. On January 8, 1904, there was filed the third amended answer of the defendants, denying the allegations in plaintiff's complaint that it has in all things complied with said contract; denying that there is due from defendants to plaintiff $9,024.44, with interest from the 20th day of September, 1905, or any other sum of money; denying that defendants are indebted to plaintiff in the sum of $6,268.48, or in any other sum of money whatever, except as may be hereinafter stated; denying that plaintiff furnished the lumber and piling contained in Exhibit B to said complaint; denying that defendants have refused to pay for any part of the same; denying that on the 15th day of December, 1894, defendants entered into a written contract, by the terms of which it was agreed that plaintiff should furnish lumber or piling to be used in the construction of the Choctaw, Oklahoma & Gulf Railroad; denying that defendants obligated themselves to pay for such lumber and piling in the manner stated and set out in plaintiff's amended complaint; denying that de-

fendants have accepted said lumber and piling as charged in said amended complaint. And defendants say a just account between plaintiff and defendants will show that there is due plaintiff by defendants the sum of $1,201.04, subject, however, to damages hereinafter set forth and claimed by defendants against plaintiff. Defendants further say they ought not to be held to pay to plaintiff any further sum of money, because they have already paid to one M. W. Osborn the very sum for which plaintiff sues in this case, and that the same was paid under and by virtue of a contract between the defendants and Osborn, entered into on the 7th day of December, 1894, all of which plaintiff knew and agreed to and acquiesced in, and defendants say that said sum was paid to said Osborn for the lumber and piling for which plaintiff now sues, and was paid to said Osborn with the full understanding and knowledge of the plaintiff, and with its consent. Further answering, defendants say that prior to the 20th day of May, 1895, Osborn furnished to defendants piling to the amount of $10,000; that monthly estimates were furnished Osborn, and he was paid monthly; that plaintiff knew that defendants were receiving the piles as Osborn's piles, and did not notify defendants that they were claiming same; that defendants did not know that plaintiff had any arrangement with Osborn to furnish these piles to defendants until May 20th as aforesaid, as the piles of Osborn, furnished under a contract with said Osborn. Second, further answering, defendants, by way of counterclaim, allege they were damaged in the sum of $10,000 by failure of plaintiff to comply with its contract with defendants. On February 2, 1905, plaintiff for answer to defendants' counterclaim set up in paragraph 2 denies all damages. The case was continued until the January term, 1905, and on February 2d, being one of the days of said term, the cause came on for trial before a jury, and on February 3, 1905, the jury returned the following verdict: "We, the jury, duly impaneled, sworn, and charged

to try the issues in the above styled cause, do find for the plaintiff in the sum of $11,712.58.  W. W. Isch, Foreman." On February 4th motion for new trial was filed by the defendants, and overruled by the court, and judgment rendered upon the verdict, and defendants prayed an appeal to this court.

C. B. Stuart and J. A. Hail, for plaintiff in error.

Ira D. Oglesby, for defendants in error.

TOWNSEND, J. (after stating the facts as above).  The plaintiff in error has filed eight assignments of error, as follows: "(1)  The verdict of the jury is contrary to law.  (2) The verdict of the jury is contrary to the evidence.  (3) The verdict of the jury is in excess of the amount sued for by plaintiff. (4)  The verdict of the jury is excessive, appearing to have been given under the influence of passion and prejudice.  (5) The court erred in overruling defendant's objection to that part of the evidence of the witness M. W. Osborn, whereby he testified as to the intent and meaning of the contract entered into between said M. W. Osborn and the defendant, for the reason that said contract was plain and unambiguous in its terms, and parol testimony to explain, vary, or modify its terms was inadmissible. (6)  The court erred in giving to the jury the following instruction:  "The court instructs you that the plaintiff is entitled to recover from the defendant the amount sued for, less whatever you may deem the defendant to have been damaged by virtue of an allegation made by it in its answer that the defendant was delayed in completing its work upon the railroad. (7)  The court erred in holding that it was bound by the decision of the Circuit Court of Appeals for the Eighth Circuit in this case, for the reason that said decision as to the facts of this case was not binding upon this court, and could not deprive the defendant of a trial by jury upon the issues of fact raised in this case.  (8)  The court erred in refusing to permit the defendant to prove by the witness Hitchcock the universal custom of the chief engineer of the Choctaw, Oklahoma & Gulf

Railroad Company in sending out estimates of work and material for the purpose of showing that said chief engineer did not place upon the estimate offered by plaintiff in this case the price at which said piling was furnished, to wit, 13½ cents."

Counsel say, while not waiving any of the assignments of error in this cause, we desire to insist on the general proposition, which includes nearly all the assignments of error, and that is, the court erred in its charge to the jury, as shown in the sixth assignment. The sixth assignment is that: "The court instructs you that the plaintiff is entitled to recover from the defendant the amount sued for, less whatever you may deem the defendant to have been damaged by virtue of the allegation made by it in its answer that the defendant was delayed in completing its work upon the railroad." It is conceded by counsel upon both sides of this case that the only controversy is with regard to the piles furnished between Oklahoma City and the Canadian river. The damages alleged in defendants' counterclaim, and denied by plaintiff in its reply thereto, were fully submitted by the court in its charge to the jury, and no exceptions were taken to the charge in that respect. This limits the objection to the charge of the court, in the sixth assignment, to the question whether the court was authorized to direct a finding for the plaintiff upon the evidence introduced on the trial that plaintiff had delivered to the defendants the piles sued for in this action. It must be remembered that the only question that can be litigated in this case is the difference between plaintiff and the defendants under the contract of December 15, 1894. Whatever controversy existed between M. W. Osborn and the defendants under the contract entered into between them on December 7, 1894, cannot be settled in this lawsuit. Hence the only material question involved in this case is: Did the plaintiff furnish the piles to the defendants as alleged in its complaint, and were those piles when accepted by the defendant used by the defendant in the con-

struction of the railroad?    The law of this case announced by
the Circuit Court of Appeals, and reported in 120 Fed. 795,
57 C. C. A. 163, is very clearly stated, and is binding upon this
court.    Judge Sanborn, in delivering the opinion of the court
in that case, asks this question: "May one who has know-
ingly accepted and applied to his own use property of his con-
tractor, furnished by the latter under the agreement between
them, escape payment of the contract price or value of the
property delivered by proof that. when he accepted and used
it he notified his contractor that he refused to receive it as his
property, and accepted it as the property of another, and that
he paid the third party therefor?"    The evidence introduced
upon the last trial was substantially the same as that introduced
at the first trial, and the statement of 'facts, as set out by the
Circuit Court of Appeals in its report of this case, is as applicable
to the last trial as to the first; and in the enumeration of those
facts it is stated: "At or near the inception of the delivery of
this piling, Good & Co. were notified that it was the property
of the plaintiff, and was delivered under its contract pursuant
to the agreement which it had made with Osborn, that he should
furnish and deliver the piling for the coke company.    During
the entire course of the delivery both Osborn and the coke
company repeatedly informed Good & Co., and insisted that
this piling was the property of the coke company, that it was
delivered under its contract, and that it was paying Osborn for
procuring and furnishing the piling pursuant to its contract
with him.    While Good & Co. protested to Osborn against
accepting the piling as the property of the coke company, and
informed him that it accepted it as his property under the
contract of Good & Co. with him, neither the coke company
nor Osborn assented to this view of their property rights, and
Good & Co. put the piles into the railroad."                        .

Mr. Hitchcock, superintendent for the defendants, in
his testimony for the defendants, upon cross-examination stated

as follows: "Q. Now, you say you did not promise Osborn to rectify the estimates. Didn't he tell you that he was getting that timber under contract with the Central Coal & Coke Company? A. He did not at the time I had the conversation with him. Q. But he did tell you? A. He wrote us letters afterwards about it. Q. How long afterwards? A. I don't know exactly, but I judge in May or June that he started to notify us. Q. Didn't he do it earlier than May or June? A. Not to my recollection. Q. He notified you as early as May that the timber he was furnishing was the plaintiff's timber that he was furnishing under contract with them? A. Yes, sir. Q. Plaintiff also notified you to that effect, did they not? A. Yes, sir, May 20th. Q. So you had notice both from Osborn who was getting it out and delivering it, and from the plaintiff that it was not Osborn's piling, but it was the piling that belonged to the plaintiff? A. Yes, sir. Q. With that knowledge you received it from Osborn? A. Yes, sir. Q. And used it in your road? A. Yes, sir. Q. And didn't pay plaintiff for it? A. No, sir; we paid Osborn. Q. Did plaintiff consent to your paying Osborn for it? A. Don't know that they did. Q. Don't know that they didn't? A. I don't suppose they did consent to it, or anything about it, perhaps. * * * Q. How much of this piling had been furnished up to that time, what proportion of it? A. I don't know what proportion of it." Upon this state of facts, the Circuit Court of Appeals, in its report, on page 797 of 120 Fed., page 165 of 57 C. C. A., say: "The fact that one who has knowingly received and used the property of his contractor delivered under the agreement notified the latter when he received the property that he refused to receive it as the contractor's property, and that he accepted it as the property of another; and the further fact that he paid the third party for it, will not relieve him from liability to the contractor for the purchase price or value of his property which he has received."

The contention of counsel for plaintiff in error is that because defendants were not notified before May, 1895, that the plaintiff was furnished piling through its subcontractor, Osborn, that the defendants would not be responsible for piling furnished prior to that time. But did not the defendants, as a matter of fact, receive notice prior to that time? Osborn testifies that, when the estimates for February and March were delivered to him, he made upon those estimates the following indorsement: "Gentlemen, as I have stated to you, I do not accept twenty-one cents per foot as any part in payment for piling furnished between Oklahoma City and the South Canadian river, as all I claim of you is my contract price for driving, of eighteen cents per lineal foot. I look to the Central Coal & Coke Company, not you, for my pay for the furnishing of piling, as per contract with them. M. W. Osborn." And that said estimates, with said indorsement, were delivered to Mr. Walker, the bookkeeper, chief clerk, and private secretary of George S. Good & Co. It does not appear that the testimony of Mr. Walker was introduced. It was therefore within the power of the plaintiff in error easily to have shown that the estimates for February and March, with the above indorsement, were not delivered to the plaintiff in error, as stated by Mr. Osborn. Osborn further testified as follows: "A. On January 18, 1895, I sent a man from Oklahoma City to the South Canadian river to look over the ground. * * * Q. Was he a man who afterwards became a partner of yours? A. Yes, sir; and he came back and reported that the piling could be had. I then went to Mr. Hitchcock, I think. If I remember right, it was on the 18th of January, 1895, and asked him to let me the contract between Oklahoma City and the South Canadian river. He stated to me that the Central Coal & Coke Company had the contract for furnishing the piling. Q. Give the date of this. A. That was on the 18th day of January, 1895. He stated to me the Central Coal & Coke Company had the contract

for furnishing the piling from Oklahoma City to the South
Canadian river, and he could not interfere with it, and I said
if I could make an arrangement with the Central Coal & Coke
Company to furnish those piling would it be satisfactory, and
he said to go ahead, 'any arrangement you make with them
will be perfectly satisfactory to us.' Now, I have some papers
here. On the 19th of January I telegraphed Mr. Whittaker
to know what he would give me to furnish the piling between
Oklahoma City and the South Canadian river. Q. Who was
Mr. Whittaker? A. As I understood it, he was then manager
for the Central Coal & Coke Company. *    *    *
Q. What sort of a proposition did he make you? A. I
made him a proposition I would furnish the piling, I think,
for 13½ cents, and he wired me back, and here is the
telegram he sends me. This is dated St. Louis, 1-20, 1905:
'M. W. Osborn. Will accept proposition your message of
nineteenth, thirteen and one-half cents; all piling Canadian
river to Oklahoma if Satisfactory to Good & Co. Letter follows.
W. L. Whittaker.' Q. Will you attach that telegram to
your deposition and make it a part of it? A. Yes, sir. When
I got this telegram, I started to hunt up Mr. Hitchcock, and
met Mr. Hitchcock on the platform as I came out of the rail-
road office. Q. Was Mr. Hitchcock then manager for Geo.
S. Good & Co., the defendants? A. Yes, sir. He was the
man I had been doing all the business with. I showed him
this telegram, and he read it and made the remark, 'Any ar-
rangement you make with the Central Coal & Coke Company
will be perfectly satisfactory with us.' *    *    *    Q.
Then what did you proceed to do? A. I went to work, and
sent my man over there and began to get the piling out to
deliver them on the road at the bridges. Now, this was in
January. There was never anything more said then until a
pay day in March, and they made me out my estimate, and
he figures that piling from Oklahoma City to South Canadian

river the same. Q. Who did that? A. George S. Good & Co., at the same figure I had taken the piling from South Canadian river to South McAlester, when I had never put in a bid to him at all for furnishing that piling. I then notified Mr. Good in writing that I had not figured with him to furnish the piling from the South Canadian river to Oklahoma City, but I had a contract with him for 18 cents for hauling the piling from the end of the track to the bridges between those points, from the South Canadian river to Oklahoma City. Q. Have you that letter? A. I have that estimate. * * Q. Now, just explain this matter to the notary. A. In receiving these estimates, Mr. Good undertook to figure the piling between South Canadian river and Oklahoma City the same as between the South Canadian river and South McAlester. I made a notation on the estimate that I returned to Mr. Good, and stated in accepting this money I did not accept it as any part of payment for the piling furnished between Oklahoma City and the South Canadian river; that I had a contract with the Central Coal & Coke Company to furnish the same and looked to them for the same. * * * Q. Now, that was January, 1895? A. The first estimate I got. This contract. They first started in to furnish these piling in 1895. This contract was signed December 12, 1894, but I think the first estimate I got was in February or March. I am not quite certain as to that. Q. Now, do you remember getting any more estimates after that for piling furnished between the South Canadian river and Oklahoma City? A. Yes, sir. Q. What did you do with those estimates? A. I made the same notes and sent Mr. Good a copy of each one. * * * Q. What demand, if any, did you ever make on Good & Co. for pay for furnishing piling between South McAlester and Oklahoma City? A. I never made any. Some time in February, 1895, I had a conversation with Mr. Hitchcock, who was then manager for George S. Good

& Co., in regard to the piling furnished between the South Canadian river and Oklahoma City. The conversation was at my shanty on section 24. Q. Who was present at this conversation? A. No one, except Mr. Hitchcock and myself. Q. What was that conversation? A. This was at the time I received the first estimate. I held the estimate, and he came along and I told him the estimate was wrong, that he was figuring the piling the same between South Canadian river and Oklahoma City as he figured between South Canadian river and South McAlester, and he took the estimate and looked it over and promised to rectify it, and, when I went over to see them and get them to rectify it the next month, they refused to do it.    *    *    *    Q. Now, Mr. Osborn, can you state how many piling you furnished under your contract with the Central Coal & Coke Company between the South Canadian river and Oklahoma City? A. I can only through those vouchers. Q. You can just take them and refresh your memory with them and then say how much you furnished. After refreshing your memory by the vouchers, how much piling did you furnish the Central Coal & Coke Company under your contract with them for Geo. S. Good & Co. in their work between the South Canadian River and Oklahoma City? A. 39,178 feet.    *    *    *    Q. Between what periods of time was it that the Central Coal & Coke Company furnished through you to Good & Co. the piling you hve been talking about used between the South Canadian river and Oklahoma City? A. Between January 20, 1895, and September 30, 1895." Mr. Hitchcock, in his testimony, denies the various conversations with Mr. Osborn that were testified to by Mr. Osborn, and also denies that he ever was shown the telegram or any estimates.

· J. C. Sherwood, a witness for the defendant in error, plaintiff below, testified that he was the auditor of the defendant in error during the year 1895, and further as follows:

"Q. I will ask you to examine this account rendered, and state whether or not there is any piling on that against the firm, and, if so, give date and amount of it? A. May 20th, $2,073.12. Q. On the account rendered for piling? A. Yes, sir. Q. What piling is that, from whom did you get it? A. We bought it from M. W. Osborn.  *  *  * Q. Examine the different vouchers, if you have any, based upon the engineer's report paid Osborn? A. There are three vouchers here. Q. How much is that one? A. $1,749.20. Q. The date? A. May 30th. Q. Give the date of the next one? A. August 23d, $275.94. Q. Give date and amount of the next one? A. November 12th, $3,263.90. Q. How much balance do they owe upon account for lumber and piling furnished, do you know the total amount of it? A. I would have to look at that statement. In the neighborhood of $9,200; $9,024.42.  *  *  *  Q. Now, I will ask you to give dates if you can, if you have any data by which you can give the dates of funishing that piling. Does that account contain the dates of the shipment of piling? I want to get the dates of the shipment of the piling, if you have it, from their estimate, or whatever you base it on? A. There was a bill rendered May 20th, for $2,073.12. Q. Give the next one? A. July 30th, $327.04. Q. Give the next? A. September 20th, $3,868.32. Q. Now explain to the jury whether these respective amounts were furnished at one time, or was it furnised from time to time during the year, and that is the gross amount based upon the engineer's estimate? A. That was tde gross amount, based upon the engineer's estimate at each inspection. Q. At the end of the month the engineer would make up his estimate and report the gross amount? A. Yes, sir. Q. What date was the account due, when were these estimates due? A. Twentieth of the month following."

Counsel for plaintiff in error insist that the January,

February, March, and April estimates were all in, and Osborn had been paid for the very piling for those months sued for by plaintiff in this case, but he fails to state who testified to that fact, or upon what page of the record such evidence can be found. From as close an inspection as we have been able to make, the payment for the piling was all made after it is admitted that the plaintiff in error had received notice of these estimates, and after he had received notice that the defendants in error had furnished this piling through Osborn; and, if that be correct, the court in its instruction to tde jury to find for the plaintiff, as well as the statement of the Circuit Court of Appeals, were correct. It is no where shown that when these notices were received that plaintiff in error had settled with Osborn. On the contrary, no settlement was made with Osborn until after this suit was brought.

Selvin Douglas, a witness for the plaintiff in error, testified as follows:" Q. I will ask you whether or not you know a man by the name of M. W. Osborn? A. I know of him. I have no personal acquaintance with him, except to meet him once for a very few moments. Q. Do you know whether or not Osborn made a claim against Good & Co. in Oklahoma for money for work done and material furnished on the road? A. Yes, sir. Q. For how much money? A. Eight thousand dollars. Q. State whether or not that claim was made for a balance due or claimed to be due him by Geo. S. Good & Co.? A. Yes, sir, it was due the firm of Osborn & McGinnis, or M. W. Osborn & Co. It went by different titles. Q. Who asserted that claim for Osborn, if anybody? A. Mr. Carson, the receiver of Osborn. Q. Please state whether that claim, so made by Osborn, was settled and paid by Geo. S. Good & Co.? A. It was. Q. Who paid it? A. The money was sent to me, or rather to the firm of Douglas & Douglas, myself and son, by Geo. S. Good & Co., and we paid it to the receiver. Q. You paid

it to Osborn's receiver? A. Yes, sir. Q. When was that settlement made? A. It was pending a long time. It was finally made about a month ago. Q. After this suit was commenced a long time? A. I don't know. Q. The lawsuit was begun on the 17th of September, 1895? A. Yes, sir; it was litigation that had continued a long time. Q. Good & Co. made no settlement until a month or two ago? A. I think so." It thus appears to be conclusive that a large balance was paid to the receiver of Osborn years after the plaintiff in error had full knowledge of the claim of defendant in error against them.

The fifth assignment of error is as follows: "The court erred in overruling defendant's objection to that part of the evidence of the witness M. W. Osborn whereby he testified as to the intent and meaning of the contract entered into between said M. W. Osborn and the defendant, for the reason that said contract was plain and unambiguous in its terms, and parol testimony to explain, vary, or modify its terms was inadmissible." The answer to that alleged error was given by the Circuit Court of Appeals, as follows: "The rule that parol evidence is inadmissible to contradict or vary the terms of a written contract is inapplicable to a case in which the agreement assailed is between strangers to the parties to the suit, because the former cannot by their ignorance, carelessness, or fraud estop the litigants from proving the truth. 1 Greenl. Ev. § 279; Cunningham vs Milner, 56 Ala. 522; Talbot vs Wilkins, 31 Ark. 411; Hussman vs Wilke, 50 Cal. 250; McMaster vs Ins. Co. of North America, 55 N. Y. 222, 14 Am. Rep. 239; Brown vs Thurber, 77 N. Y. 613; Id., 58 How. Prac. (N. Y.) 95; Bell vs Woodman, 60 Me. 465; Tobey vs Leonard, 2 Cliff. 40, Fed. Cas. No. 14,067; Edgerly vs Emerson, 23 N. H. 555, 55 Am. Dec. 207."

We are of the opinion that the other assignments of error are not well taken, and that the judgment of the court below was correct, and it is therefore affirmed.

GILL, C. J., and LAWRENCE, J., concur.