TALBOT et al. vs. WILKINS et al.

1. EVIDENCE:
The rule which excludes parol evidence for the purpose of varying a written contract, is confined to the parties to the contract, and does not preclude strangers to it from introducing such evidence.

2. ————:
The testimony of a witness upon an examination in bankruptcy, which is taken before a United States Commissioner and reduced to writing, cannot be proved by parol evidence. The deposition, or a certified copy under the seal of the court, must be produced.

3. SUBROGATION: *Jurisdiction, waiver, etc.*
The right of subrogation is founded in the rules and practice of Courts of Equity, and a party seeking it should resort to that court: but if he should seek relief in a court of law the defendant cannot take advantage of the mistake, unless he files a motion to transfer the cause to the equity docket, under the provisions of the Code of Practice.

4. ————: *Of surety by payment, etc.*
A surety who pays the debt of his principal is subrogated to all the remedies of the creditor as against the principal, or others who become liable for the debt.

5. WARRANTY:
A warranty of title will not arise where the circumstances show that the vendor did not intend to warrant, and was so understood by the purchaser.

6. RIGHT OF ACTION:
It is well settled that where a promise is made to one person for the benefit of another, the latter may maintain an action thereon in his own name.

7. *Admissions of one partner.*
Where a partnership is established, the admissions and representations of one of the partners about the partnership business will bind the others.

APPEAL from *Jefferson* Circuit Court in Chancery.

Hon. J. A. WILLIAMS, Circuit Judge.

*Carroll & Jones*, and *Rose*, for appellants.

*Bell & Carlton*, contra.

HARRISON, J.:

The appellees, Wilkins and Bell, together with Holcombe, one of the appellants, were sureties of Cobb in a note to Tillar, for $2,500, payable 1st day of February, 1873.

After the note fell due, Tillar brought suit on it against the sureties and recovered judgment; which judgment they, on the 14th of March, 1874, satisfied, by each paying one-third.

Wilkins and Bell brought this suit against Holcombe, and Talbot, the other appellant, to recover the amount $2,025.66, they had paid, alleging in their complaint, besides the foregoing facts, that Talbot and Holcombe, before the note fell due, purchased of Cobb a stock of goods, and as a part of the consideration therefor agreed and promised to pay off and discharge the note.

The defendants, in their answer, denied that the payment of the note was any part of the consideration in the purchase of the goods and that they ever agreed or undertook to pay it. They, as a further defense, averred : That after their purchase of the goods, proceedings in bankruptcy were commenced in the District Court of the United States, for the Eastern District of Arkansas, against Cobb, and he was declared a bankrupt, and that in the said proceedings the sale to them was set aside, as fraudulent, and the goods in their hands seized by the marshal and turned over to the assignee, and that they were adjudged to pay, and did pay the assignee $4,961.90, which they had previously received on the sale of the goods; that they had paid $3,000 besides in costs and expenses in defending their claim to the goods, and they had derived no benefit whatever from the purchase.

On the trial, Austin, a witness for the plaintiffs, testified : That he was Cobb's clerk, and present when the defendants, in the latter part of November, 1872, purchased his stock of goods. Cobb was to reserve from the stock $3,000 worth at the invoice price, to pay the note he owed Tillar, and in which Wilkins, Bell and Holcombe were his sureties ; and the defendants were to take the remainder at forty-five cents on the dollar, on those

prices, which, it was estimated, would make the cost to them about $4,000.

The trade was made at night ; the witness went next morning to see E. L. Taylor, to get him to receive the goods reserved out of the stock, for the payment of the Tillar note. He refused to take them, and witness so reported to Cobb and Talbot. Talbot and Holcombe then agreed to take those goods also, and to pay the Tillar note themselves.

An invoice of the stock was taken, in which the witness assisted, and it amounted to $12,000 or $13,000. The entire stock was turned over to them, and they sold the whole of them.

Their sales up to the time when the goods were seized by the marshal, amounted to about $4,900. Talbot bonded them, and then sold the remainder, and he bought up the claims of Cobb's creditors.

On cross-examination, he stated that the agreement was reduced to writing, and signed by the parties in the store, on the night the trade was made.

He was then asked by the defendant's counsel, if he did not say, when testifying before the commissioner in the bankrupt proceedings against Cobb, in the room adjoining the court room, that the Tillar note was not mentioned, and its payment formed no part of the consideration, or of the contract ; to which he answered that he did not remember testifying in that room, and had no recollection of so testifying. That it was his understanding, from the conversation of the parties at the time, the Tillar note was to be paid.

Bell, one of the plaintiffs, testified for them, that he, Wilkins, and Holcombe, in the spring of 1872, became sureties for Cobb, in the note mentioned in the pleadings. That Cobb, about the latter part of November, 1872, expecting, as he said, to be embarrassed, and wishing to secure his sureties, proposed to turn

over to E. L. Taylor, for Tillar, $3,000 worth of goods. Taylor, when applied to, declined to receive the goods. Witness then, upon consultation with Wilkins and Holcombe, concluded to receive them himself, and Cobb consented to turn them over to him. Holcombe, upon request of witness, promised to go to the store that evening and have the goods turned over. On the next morning, or the morning after that, he saw Holcombe, and asked him if he had got the goods. He said he had done better than that; that he and Talbot had purchased Cobb's entire stock, and made a good thing of it. Witness asked him if, in the purchase, the sureties in the Tillar note were protected or secured. He replied that they were, and witness need give himself no further concern about the matter—the note would be paid. A few days after, witness saw him again, when he spoke about the threatened proceedings in bankruptcy against Cobb, and said that in order to protect themselves, it would be probably necessary for him and Talbot to destroy certain papers. What the papers were, witness did not know, but said to him it made no difference to him, so they paid the Tillar note and saved him and the other sureties, harmless; and he replied, "that will be done;" and, "do not be uneasy about that."

The sureties were afterwards sued on the note, and judgment recovered against them. Witness and Wilkins paid off the judgment—$2,025.83, no part of which had been repaid them by the defendants. The judgment was paid about the 6th of March, 1874.

The plaintiffs then read the deposition of Cobb. He deposed that about the last of November, 1872, he sold his stock of goods, in Pine Bluff, worth, according to the invoices, $12,000, to the defendants, for which they were to pay him, except for $2,500 reserved therefrom to pay a note he owed Tillar, in which the plaintiffs and defendant Holcombe were his sureties, 45 per cent. of the value, which was the best price he could at

the time get. He made no warranty of title; the very low price at which the goods were sold was in consideration of the risk defendants incurred in the purchase. In the sale, the payment of the Tillar note was provided for, and he himself had never paid it, or any part of it, but his sureties had paid it. At the time he sold to the defendants, they gave him their note for $3,882, upon which Talbot had paid him $1,350, and he had given him his individual note for the remainder,.and nothing had since been paid. The goods were sold by the defendants, or by Talbot, who bought out Holcombe.

The defendants, after the plaintiffs had closed their testimony, moved to exclude all evidence as to the terms of the sale, on the ground that it appeared that the agreement in relation thereto had been reduced to writing. Their motion was overruled, and they reserved an exception.

The defendants testified in their own behalf. Holcombe testified: That he and Talbot made a trade with Cobb in November, 1872, for his stock of goods, or rather, they made two or three trades. The first was, that they should take the stock after Cobb had reserved goods to the amount of $3,000, to be turned over to E. L. Taylor to pay the Tillar note, and pay him 45 per cent. on the cost; the goods to be invoiced, and the payment to be made in cash or on short time. The next day Austin was sent to Taylor, to get him to take the goods and pay the note to Tillar. Austin returned and reported that Taylor declined to take the goods. Witness and Talbot then agreed to take them and pay the note themselves; but, before it was done, they were informed that such a preference to a creditor would be in violation of the bankrupt act, and subject the goods to seizure in bankruptcy, whereupon they made a new trade, and did not assume the payment of the Tillar note. This last trade was reduced to writing and signed, and was the only one that was consummated. By Cobb's consent, he took the note they gave him, and

placed it in Wilkins' hands, to be held until the invoice was made, intending to have him pay Tillar out of the money when they paid it, and no other arrangement or provision was made for the Tillar note.

Witness told Bell, after the trade was made, that the payment of the Tillar note was secured, and the sureties protected in the trade, but he did not tell him how it was done. He meant that his and Talbot's note to Cobb had been placed in Wilkins' hands, out of which he intended Tillar should be paid; and that would have been done but for the fact that the goods were seized in the bankruptcy proceedings against Cobb, and the note taken and its payment compelled to the assignee. Witness sold his interest in the goods to Talbot, for which he received his account in the store and an interest in the Rob Roy place, valued at $2,200.

Talbot testified: That the trade was as stated by Holcombe. He knew nothing about the delivery of his and Holcombe's note to Wilkins, or the conversation between Bell and Holcombe; and he had never had any understanding with Holcombe about the Tillar note, and its payment was not provided for in the trade. They made no other trade than that shown by the instrument of writing they signed. Some days after the trade, the goods were seized in the bankruptcy proceedings against Cobb, and he paid the note he and Holcombe had given in the purchase of the goods to Cobb's assignee. Witness, in order to save the goods, bought the claims of Cobb's creditors, which he obtained at a discount, and thereby controlled them. He had, before buying the claims, given bond and released the goods. The goods cost him $10,000, and much more than they were worth.

When Austin returned from seeing Taylor, the next day after the first trade, and told witness that Taylor refused to accept the goods and pay the Tillar note, witness said that he and Holcombe would take them and pay the note; but being very soon

after informed, that if they agreed to pay the note as a part of the consideration in the purchase of the goods, it would bring the transaction within the bankrupt act, witness told Cobb he would not agree, in the trade, to pay the note.

On cross-examination, he stated, that they got the entire stock, the $3,000 worth, that were to be reserved, with the rest, and they gave no other note than that mentioned in the instrument of writing, upon which he had paid him about $1,300, and for the balance had given him his individual note, but they had never paid him anything more. They sold about $5,000 worth of the goods before they were seized, and after he had released them, he sold the remainder. He had never paid the judgment in the District Court against Holcombe and himself, or any part of it. That the debts proven against Cobb amounted to $24,000 or $25,000, for the most of which he paid 25 cents in the dollar; more for a few, and as high as 75 cents in the dollar for some. By buying all the claims, he acquired the entire interest in Cobb's estate, and it was in that manner the judgment against Holcombe and himself, and the note to Cobb, were extinguished.

The following instrument of writing, referred to by the last witness, and proven by him, was then read.

"PINE BLUFF, ARK., Nov. 26th, 1872.

"This agreement witnesseth: That whereas B. E. Cobb has this day sold and conveyed all of his stock of goods wares and merchandise in his store house in said town of Pine Bluff, for the sum of $4,100.60 to John H. Talbot and James M. Holcombe, and whereas said sale is based upon an estimate of said stock at the whole sum and value of $9,250, at the invoice price of said goods: Now it is agreed between all the parties hereto that a true and perfect inventory of said goods shall be taken by items, and if said stock shall fall short of said sum of $9,250, then said Talbot and Holcombe shall be entitled to a credit upon

*Vol. xxxi.—27.*

their note, which is this day executed; at the rate of 45 per cent. for the amount which may be lacking to make up said sum; and if the stock should be of greater value than said sum of $9,250 upon inventory, then said Holcombe and Talbot shall pay said Cobb an additional sum at the same rate per cent.

"In testimony whereof all of said parties hereunto set their hands and affix their seals, at Pine Bluff, Arkansas, this the 26th day of November, 1872.

"JOHN H. TALBOT,    [L.S.]

"JAS. M. HOLCOMBE, [L.S.]

"B. E. COBB.        [L.S.]"

The defendants then called W. D. Johnson, who was asked if he was present when J. A. Austin, the witness for the plaintiffs, testified before the commissioner in the proceedings in bankruptcy against Cobb, and he answered that he was. He was then asked where it was, and he said in the room adjoining the court room, and he was then again asked whether said witness did not then say, when so testifying, that in the trade between Talbot and Holcombe and Cobb for the goods, that the Tillar note was not considered, and its payment formed no part of the contract? which question the court, upon objection of the plaintiffs, would not permit him to answer.

They then read the proceedings in the District Court setting aside the sale of the goods, and the judgment of said court in favor of Cobb's assignee against them for $4,941.90, the amount of their sales before the seizure.

This was all the evidence in the case.

The court gave the jury, against the objection of the defendants, at the instance of the plaintiffs, the following instructions:

*First*—If the defendants purchased from Cobb the stock of goods mentioned in the pleadings without warranty of title, and agreed, in the purchase, to pay the Tillar note, but failed to

do so, and the sureties of Cobb had been compelled to pay it, the plaintiffs are entitled to recover from them the amount they paid.

*Second*—If the defendants purchased the stock of goods, without warranty, and at their own risk, the subsequent bankruptcy of Cobb, and losses of defendants by reason thereof were no failure of consideration, or in anywise released the defendants from any liability upon the non-performance of their part of the agreement.

It refused to give the following asked by the defendants:

*First*—If the entire contract between Cobb and the defendants, for the sale and purchase of the goods, was set aside and held void for fraud, by the District Court of the United States, in the bankruptcy proceedings against Cobb, and the goods so sold and purchased seized by order of said court, and that judgment is still in force; all promises and undertakings growing out of, or depending upon said sale and purchase made before such adjudication, were thereby annulled and made void, and the defendants are not bound by said contract.

*Second*—If the trade between the defendants and Cobb was so annulled by the proceedings in bankruptcy against Cobb that defendants received no benefit from it, the plaintiffs cannot recover.

*Third*—If the payment of the Tillar note was assumed by the defendants in the purchase of the goods, but the stock with the proceeds of the sales made, were seized as before stated, and turned over to the assignee of Cobb, and the defendants lost all benefit from their purchase, the consideration for such undertaking has failed and the verdict must be for the defendants.

*Fourth*—If the *assumpsit* alleged in the complaint was made solely between Cobb, Talbot and Halcombe, the plaintiff cannot recover.

*Fifth*—If the defendants bought the goods from Cobb and gave their note therefor, and Holcombe, with Cobb's consent, deposited said note with the plaintiff Wilkins to pay the Tillar note, and this was the only provision for the payment thereof, and the note deposited with Wilkins was seized in bankruptcy proceedings against Cobb, and the defendants were compelled to pay the same to the assignee of Cobb, the verdict should be for the defendants.

*Sixth*—No statement made by Holcombe to Bell, in the absence of Talbot and without his consent, will, in itself, have any effect on Talbot.

The jury returned a verdict in favor of the plaintiffs for $2,209.91.

The defendants moved for a new trial on the grounds that the court erred in admitting parol evidence as to the contract between Cobb and themselves, in refusing to allow them to prove by the witness Johnson the statement of the plaintiff's witness Austin, when testifying in the bankruptcy proceedings against Cobb, in giving the instructions moved by the plaintiffs, and in refusing those moved by themselves, and that the verdict was contrary to the evidence.

The court overruled their motion, and they excepted and appealed.

The first question is.   Did the court err in refusing to exclude from the jury the oral testimony in relation to the sale of the goods?

The rule that parol evidence is inadmissible to contradict or vary the terms of a written instrument is necessarily confined in its applications to the parties to it, or those claiming some right or interest under it.   Greenleaf says it is "applied only in suits between the parties to the instrument, as they alone are to blame if the writing contains what was not intended, or omits that which it should have contained.   It cannot affect third persons,

who, if it were otherwise, might be prejudiced by things recited in the writings contrary to the truth, through the ignorance, carelessness or fraud of the parties, and who, therefore, ought not to be precluded from proving the truth, however contradictory to the written statements of others." 1 Green. Ev., sec. 279.

In this case the plaintiffs were not parties to, nor claimed any benefit from the contract made on the night of the 26th of November. The agreement, to the benefit of which they seek to be subrogated to Tillar, was that made the next morning, by which the defendants took the $3,000 worth of goods reserved from the stock the night before, and assumed to pay the Tillar note, and were, therefore, entitled to show that such an agreement was made, and all the circumstances attending.

The next exception reserved upon the trial was, to the refusal of the court to permit the defendant to prove, by Johnson, what was said by the plaintiffs' witness Austin, when testifying before the commissioner in the bankruptcy proceedings against Cobb.

Such evidence was properly rejected. The examination before the commissioner was taken in writing (sec. 5003 Rev. Stat. U. S.), and the deposition, or a certified copy, under the seal of the court, was the only admissible evidence of the witness' testimony in that case.

Before considering the instructions given and refused, it is important to determine the real nature of the action.

The plaintiffs seek by their suit to be subrogated to Tillar in respect to the obligation assumed by the defendants to pay the note which Cobb, and they as his sureties, owed him.

"Subrogation is," as defined by Bispham, "the equity by which a person who is secondarily liable for a debt, and has paid the same, is put in the place of the creditor, so as to entitle him to make use of all the securities and remedies possessed by the

creditor, in order to enforce the right of exoneration as against the principal debtor, or of contribution against others who are liable in the same rank with himself." Bisph. Eq., sec. 335. And this right of subrogation, he says, " is not founded on contract, but on general principles of equity." Ib., sec. 338.

Though, as is thus seen, the right of subrogation is an equitable one, the plaintiffs, to enforce it, have brought an action at law. This, however, is not now to be deemed an error. The defendants might have moved, at or before the filing of their answer, to have the action changed into equitable proceedings by proper amendment of the complaint, and its transfer to the equity docket. Gantt's Digest, secs. 4461, 4464. And, by sec. 4463, it is declared, that unless such correction is made, the error is waived. Newm. Plead. and Prac., 236.

We come now to consider the questions which arise upon the instructions given and refused. The two given for the plaintiffs relate to the claim of the right of subrogation, and the effect of a sale of goods, without a warranty of the title.

The doctrine or principle of subrogation cannot be more succinctly stated than it is by the authority just quoted. He says: "This equity of subrogation is one eminently calculated to do exact justice between persons, who are bound for the performance of the same duty or obligation, and is one, therefore, which is much encouraged and protected. This may be seen from the rule which allows the surety to keep alive a judgment for the purpose of obtaining satisfaction out of the principal. Ordinarily, the payment of a debt operates as an extinguishment, and the judgment obtained for the debt would necessarily fall with it. To apply the rule to the case of a surety paying the debt would obviously work injustice in many instances; for, by coming in as a simple contract creditor, the surety might lose his chance of reimbursement. It has accordingly been held, and must be considered to

Talbot et al. vs. Wilkins et al.

be the generally received doctrine, that a surety who pays a debt which has been reduced to judgment, is entitled to have the judgment kept alive for his benefit, and to enjoy, as against the principal debtor, exactly the same advantages which could have been claimed by the judgment creditor." Bisph. Eq., sec. 336. *Newton* v. *Field*, 16 Ark., 116; *Cottrell's Appeal*, 23 Penn. St., 294; *Marsh* v. *Pike*, 10 Paige, 595; *Hays* v. *Ward*, 4 Johns. Ch. R., 123; *Burrows* v. *McWhann*, 1 Desaus, 409.

We think, then, if Tillar might, by suit, have compelled the defendant, upon their agreement with Cobb, to pay the note, the plaintiffs, having paid it to Tillar, have clearly the right to be subrogated to him.

As to the warranty of title, the circumstances attending the sale strongly conduced to show that the defendants were aware that Cobb was in debt, and in failing circumstances; and whether they did or not, they must be presumed to have known that a sale, such as that of his entire stock, and at less than one half of its value, was itself an act of bankruptcy, and subjected the goods to seizure.

A warranty of title will not arise where the circumstances of the case clearly show that the vendor did not intend to warrant, and was so understood by the vendee. · Sto. on Sales, sec 367 *a;* Benjamin on Sales, 476.

There was no error in giving the two instructions for the plaintiffs, nor in refusing the first three moved for by the defendants, which are, in principle, the converse of those given for the plaintiffs.

It is well settled, where the promise is made to one for the benefit of another, he for whose benefit it was made, may sue thereon in his own name. 1 Ch. Plead., 5; *Schmerhorn* v. *Vanderheyden*, 1 Johns., 139; *Strohecker* v. *Grant*, 16 Serg. & Rawl., 241; *Harper* v. *Ragan*, 2 Blackf., 39; *Farmers' Bank* v. *Brown*,

1 Harrington, 330; *Felton* v. *Dickinson*, 10 Mass., 287; *Arnold* v. *Lyman*, 17 Mass., 400. The fourth instruction moved for by the defendant was therefore properly refused.

The fifth, as a proposition of law, was, we think, not objectionable; but it appears, by their bill of exceptions, that the court gave for them other instructions of similar import. The defendants were not, therefore, prejudiced, and there was no error in refusing it.

And there was no error in the rejection of the sixth. That the defendants were partners in the purchase of the stock of goods, was both proven and admitted, and there can be no question, that the admissions and representations of one partner, relative to the business of the partnership, bind the firm. Par. on Part., 184; Sto. on Part., sec. 107.

The remaining ground of the motion for a new trial is, that the verdict was contrary to the evidence.

The evidence was ample to sustain the verdict. If the cause had been tried without the intervention of a jury, and as in chancery, the plaintiffs, no doubt, would have obtained a decree, and for the same amount awarded by the jury.

The defendants got Cobb's entire stock of goods; those reserved to pay the Tillar note, as well as those for which they gave their own note, and it is very clear, that in the sale Cobb intended and purposed, if such was not his main object in making it, to provide for the payment of the Tillar note, and to indemnify and save harmless his sureties; and that it was the understanding and agreement, tacit or expressed, that the defendants should, as a part of the consideration for the goods, assume and pay it. The note they gave was for the balance of the goods, after reserving the $3,000 worth, and if these were not to be paid for in this way, they obtained them without any consideration.

It is very apparent that there was no warranty of the title. The peculiar circumstances under which the sale was made; Cobb's failing condition, evidently known to the defendants, and his inability to make good any loss to them; the effort made to evade the bankrupt law, and the extremely low price at which the goods were sold, precludes all idea or implication of warranty.

Nor, though held to make good their promise to Cobb, do they appear to have been losers in the transaction. The stock at invoice prices was proven to be worth $12,000 or $13,000. The utmost that it cost Talbot, who, it seems, bought out Holcombe, according to his own testimony was $10,000, and this included, it must be remembered, what he paid Holcombe for his interest.

The judgment of the court below is affirmed.