BRISCOL v. AMERICAN SOUTHERN TRUST COMPANY.

Opinion delivered April 2, 1928.

1. BILLS AND NOTES—TRANSFER OF NOTE AFTER MATURITY.—The fact that a note is transferred after maturity is of no importance except as to equities between the prior parties, the rule being that an indorsee or transferee after maturity takes subject to defenses between the original parties.

2. BILLS AND NOTES—TRANSFER AFTER DEATH OF MAKER.—The death of the maker of a note does not in any way affect its negotiability.

3. PLEDGES—TRANSFER OF COLLATERAL SECURITY.—Where a bank had a right to sell a note secured by a certificate of deposit, it was authorized to transfer the collateral security as an incident of the sale.

4. SUBROGATION—RIGHTS OF ONE SECONDARILY LIABLE ON NOTE.—One who is compelled to pay a note on which he is secondarily liable is subrogated to all the rights of the payee.

5. SUBROGATION—PAYMENT OF NOTE.—The right of subrogation to the payee's right on payment of a note extends, not only to indorsers, but also to sureties and guarantors.

6. SUBROGATION—RIGHTS OF PARTY SUBROGATED.—Where one who is secondarily liable is required to pay a note, secured by collateral, he acquires title to the note, and becomes owner of attached collateral.

7. PLEDGES—SALE OF NOTE SECURED BY COLLATERAL.—In a sale of a note secured by collateral, the collateral passes as a mere incident of the sale of the note.

8. PLEDGES—TRANSFER OF COLLATERAL.—Where a bank held a note secured by collateral, the note being past due and the maker dead, *held* that it had a right to deliver the note with attached collateral when paid by any one whose liability thereon was fixed, either as surety, guarantor, or indorser.

9.  BILLS AND NOTES—EFFECT OF SIGNING NOTE AFTER MATURITY.—
    Where a bank had a note of a dead maker which was past due,
    and the brother of the maker and the administrator of the
    maker's estate signed their names on the note, *held* that the
    brother so signing was not an indorser, within the Negotiable
    Instruments Law (Crawford & Moses' Dig., § 7830), defining the
    liability of an irregular indorser, and § 7832, fixing the liabil-
    ity of general indorsers.

10. CONTRACTS—COLLATERAL CONTRACT.—Where a brother and admin-
    istrator of decedent's estate signed a note of decedent after matur-
    ity, and executed another note in their name in consideration of
    the bank's foregoing foreclosure of collateral given by decedent
    to secure his note, *held* that the undertaking was a distinct con-
    tract collateral to the original undertaking of the decedent and
    supported by sufficient consideration.

11. SUBROGATION—RIGHT TO COLLATERAL.—Where the brother of a
    deceased maker of a note indorsed the note, which was secured
    by collateral, after its maturity, *held* that, on being compelled to
    pay the note, whether as guarantor or surety, he would be sub-
    rogated to the rights of the payee and to receive the collateral.

12. BILLS AND NOTES—GUARANTY.—Where a brother of the deceased
    maker of a matured note signed it after maturity, in considera-
    tion that the bank holding the note should agree to forego fore-
    closure of collateral security, he was a guarantor.

13. SUBROGATION—RIGHTS OF GUARANTOR.—One who becomes guar-
    antor of another's note without the knowledge or consent of such
    other and who by reason of his guaranty pays the note becomes
    by operation of law the purchaser of the debt, stands in the shoes
    of the principal creditor, and as such is entitled to all collateral.

14. PRINCIPAL AND SURETY—LIABILITY OF GUARANTOR.—Under Craw-
    ford & Moses' Dig., § 7762, designating those primarily liable on
    a note, the liability of a guarantor as distinguished from that of
    surety is secondary.

15. SUBROGATION—RIGHT OF GUARANTOR.—The right of a guarantor to
    subrogation by reason of payment of the principal's debt does not
    exist unless the payment was made by one who was at the time
    required to pay it; and, if he paid it prior to the maturity of the
    debt, he will be regarded as a stranger to the debt.

16. PLEADING—MOTION TO MAKE COMPLAINT MORE DEFINITE.—In an
    action against a bank for conversion of collateral, if the com-
    plaint failed to show that, at the time of delivery of the col-
    lateral to the guarantor, he was legally obligated to pay the
    debt, *held* that the bank should have, by motion in lower court,
    requested that plaintiff be required to allege facts with more
    definiteness.

17. BILLS AND NOTES—RIGHTS OF STRANGER PURCHASING NEGOTIABLE PAPER.—A stranger may purchase negotiable paper, either before or after maturity, in which event the paper is not discharged, and he becomes the holder of the same with all the rights of the assignor, including the right to receive such collateral as his assignor may have had.

18. BILLS AND NOTES—PURCHASE OF NOTE BY STRANGER.—Where a stranger pays another's note, he is presumed to have purchased the same, and the note is not discharged.

19. BILLS AND NOTES—PRESUMPTION AS TO PURCHASE OF NOTE BY STRANGER.—While the payment of another's note by a stranger is presumed to have been a purchase, such presumption is not one of law, but of fact, and may be rebutted.

20. PLEDGES—EFFECT OF PAYMENT OF ANOTHER'S NOTE.—In an action against a bank for conversion by delivery of collateral to the brother of deceased maker of a matured note, where the complaint was silent as to whether the note was delivered to the brother, and it did not appear from the complaint whether the note was marked "Paid," or whether it was delivered with intention that it was not being discharged, but that title thereto was merely being transferred together with collateral, *held* that as a matter of law the court could not say that such payment was made by a purchaser.

21. BILLS AND NOTES—PAYMENT OF NOTE BY STRANGER.—Under Crawford & Moses' Dig., § 7885, providing that payment by or on behalf of the maker of a note will discharge it, payment of a note by a stranger, if made for and on behalf of the maker, will discharge the debt.

22. BILLS AND NOTES—PAYMENT OF NOTE BY STRANGER.—Under Crawford & Moses' Dig., § 7885, providing that payment of a note by or on behalf of a maker will discharge it, payment by a stranger on behalf of himself with intention of acquiring title to note and collateral attached does not discharge the note and debt, justifying delivery of the collateral to him.

Appeal from Pulaski Circuit Court, Third Division; *Marvin Harris,* Judge; reversed.

*Kirby & Hays,* for appellant.

*Trieber & Lasley,* for appellee.

W. H. RECTOR, Special Judge. Appellant sued appellee in trover, charging it with the conversion of certain collateral which had been deposited with it to secure a note executed by his intestate. A gen-

eral demurrer to the complaint was sustained, and, the plaintiff refusing to plead further, the action was dismissed. This appeal therefore involves the sufficiency of the complaint as tested by the demurrer.

Briefly stated, the allegations in the complaint were as follows: The appellee, a bank at Little Rock, held a negotiable promissory note of appellant's intestate, M. C. Pappas, in the principal sum of $700. This note was secured by a certificate of deposit in the Banque Nationale de Greece of the alleged value of $5,000. When this note matured, its maker had died, and the appellant, as administrator, was without funds with which to pay the note and redeem the collateral. At this time the appellant and H. C. Pappas, a brother of the deceased, entered into an agreement with the bank whereby they indorsed their names upon the past-due note of the deceased, and at the same time gave a new note executed by them individually, to serve as a renewal or a continuance of the old note.

The allegations with respect to the new note were as follows: "Plaintiff states that, after the death of the said M. C. Pappas, he, together with the said H. C. Pappas, a brother of deceased, put their indorsement upon said note past due, and also executed a new note individually to cover said loan and to serve as a renewal or continuance of said original note."

The complaint further alleges that the bank did not present its claim for allowance by the administrator and did not have it probated.

After the extension agreement above referred to, but before the expiration of the time for probating claims against the estate, the complaint alleges that the appellee "accepted payment of its note from H. C. Pappas, the brother of the deceased, and wrongfully delivered at the time to H. C. Pappas the said security held by it, which was of the value of $5,000, against his directions and over his protest, and refused to deliver same to this plaintiff, upon proper demand made therefor, thus converting said

securities unlawfully to its own use." It is further alleged that the estate of the deceased was insolvent.

Appellant contends for a reversal of the judgment upon the ground that, after the maturity of the note and the death of the maker, it ceased to be negotiable, and that the delivery of the note, with the collateral attached, amounted to a conversion, for which the appellee was liable. He cites the case of *Union & Mercantile Trust Co.* v. *Harnwell,* 158 Ark. 295, 250 S. W. 321, as controlling the judgment in this case. The appellant also contends that H. C. Pappas was not an indorser of the old note within the meaning of the law relating to the rights and liabilities of an indorser of commercial paper.

Whether or not an instrument is negotiable or non-negotiable depends upon our statute (§ 7767, C. & M. Dig.). An instrument once negotiable continues to be negotiable until it is discharged in the manner prescribed by the law (§ 7885-7886), or until it is restrictively indorsed. The note of the deceased at the time it was negotiated was without question a negotiable instrument, and, there being no contention that there was ever at any time a restrictive indorsement thereon, it continued to be negotiable, unless it had been discharged. Whether the act of H. C. Pappas, the brother of the deceased, in paying the note, operated as a discharge thereof, will be considered in a later portion of the opinion. We are now concerned with the effect, if any, upon the negotiability of the note of the fact that it had matured and its maker had died at the time of the execution of the so-called renewal note.

A majority of the court is of the opinion that the death of the maker and the maturity of the note did not destroy its negotiability. "The fact that a bill or note is transferred after maturity is of no importance except as to equities between prior parties, the rule being that an indorsee or a transferee after maturity takes subject to defenses between the original parties." 8 C. J., Bills and Notes, paragraph 58.

To hold that a note, once negotiable, becomes non-negotiable after maturity or after the death of the maker, would entirely destroy that security which heretofore has attended the making and negotiation of commercial paper. The channels of commerce are daily flooded with millions of such instruments, and it is indispensable to the transaction of business that one who acquires such an instrument shall be protected in his ownership and shall not be required to ascertain what in the greater majority of cases would be an impossible thing, to-wit, whether the maker or drawer had died. One who makes and negotiates a promissory note obligates himself to pay the amount named therein upon its maturity, or at any time thereafter, until the paper is discharged in one of the ways recognized by the statute. The death of a maker of a note does not in any way affect its negotiability. *Clark* v. *Thayer,* 105 Mass. 216, 7 Am. Rep. 511. We therefore hold that the fact that the maker of the note was dead and the note was past due did not in any wise affect the rights of the bank with respect to its transfer, and that it had a right to sell this note, although its maker was dead and it was past due; and, having a right to sell the note, it also had the right to transfer the collateral as an incident of the sale.

A majority of the court is also of the opinion that any one who was secondarily liable on the note would, when compelled to pay the same, be subrogated to all the rights of the payee. It is conceded by the appellant that this is true with respect to indorsers, but it is contended that H. C. Pappas was not, in contemplation of law, an indorser. The right of subrogation extends not only to indorsers but also to sureties and guarantors. 37 Cyc. 402; *Talbot* v. *Wilkins,* 31 Ark. 411, 12 R. C. L., p. 1098.

It is thoroughly settled that, when one who is secondarily liable is required to pay a note secured by collateral, he acquires title to the note, which is not discharged by his payment, and becomes the owner of the

attached collateral. In *Goss* v. *Emmerson,* 23 N. H. 38, a note was paid by an indorser who was secondarily liable thereon, and it was delivered to him, together with the attached collateral, and he had thereafter wrongfully converted such collateral to his own use. The court held that the indorser, being required by law to pay the note, was entitled to all of the rights against the principal creditor which had previously been held by the holder of the note, including the collateral, and that the fact that the indorser wrongfully converted this collateral to his own use would not render the holder of the note liable as for conversion. In *Waddle* v. *Owen,* 43 Neb. 489, 61 N. W. 731, the note, secured by collateral, was paid by an indorser, and was by the holder transferred to the indorser, together with the attached collateral. The court held that the holder of a negotiable instrument secured by collateral had a right to negotiate it and to transfer the securities with it at any time before payment or tender of payment. The court said:

"The bill being negotiable, Waddle had a right to transfer it by indorsement to Hainer, and to transfer with it the accompanying securities. There is a vast difference between the position of a pledgee who retains the principal debt and wrongfully parts with the securities pledged thereto, and that of one who, in the regular course of business, transfers the debt, and with it the securities, without diverting the latter from the purpose for which they were pledged. The first act constitutes a conversion, the latter does not." See also *Chapman* v. *Brooks,* 31 N. Y. 75; Jones on Collateral Securities (3d ed.) §§ 418, 421, 425.

It is equally well settled that the holder of negotiable paper secured by collateral may sell the paper with the collateral attached, and his purchaser takes title to the paper and such rights as he had in the pledged collateral. That was in effect the holding of this court in *Whitney* v. *Peay,* 24 Ark. 22.

In *Bank of Forsyth* v. *Davis,* 113 Ga. 341, 38 S. E. 836, 84 Am. St. Rep. 248, the holder of negotiable paper secured by collateral sold the paper and transferred the collateral to a third person. The court held that this was not a conversion of the collateral, but that the purchaser of the note took title thereto and that the collateral passed to him as an incident of the transfer. "As the security (collateral) is a mere incident of the original debt, just as a mortgage is a mere incident of the debt secured, an assignment of the debt passes either a legal or an equitable interest in the pledge, unless it is otherwise agreed between the parties." Jones on Collateral Securities (3d ed.), § 418. And the same author, at § 425, says: "A payee of a negotiable note, holding other notes as collateral security, may lawfully transfer the collateral notes to an indorsee of the principal note, * * * and if the indorsee to whom the securities are transferred converts them to his own use, the original payee is not liable in trover for such conversion." See also on the general proposition: 31 Cyc. 849; *Hawkins* v. *Fourth National Bank,* 150 Ind. 117, 49 N. E. 957.

When the maker of a note negotiates the same, with collateral attached, he is presumed to know that, under the law, the original payee has the legal right to sell the note and transfer the collateral, and this right exists in the original payee by virtue of his contract with the maker. "One who makes a negotiable promissory note and delivers it to another is charged by the law with notice that the payee of such note has the right to transfer it, by sale or otherwise, to whomsoever he may see proper." *Bank of Forsyth* v. *Davis, supra.* And, as stated above, the purchaser takes such collateral as may be attached as security to the note as a mere incident of the sale and transfer.

From what we have said above it is obvious that the appellee had the legal right to deliver the note, with attached collateral, upon its payment by any one whose liability thereon had been fixed either as surety, guar-

antor or indorser, and that it equally had the right to sell the note to a stranger and to transfer the collateral to the purchaser of the note. It is therefore now necessary to determine whether H. C. Pappas was liable as surety, guarantor or indorser, and, *by reason of such liability, was required to pay the note,* or whether H. C. Pappas was a stranger to the note, and, if so, whether, as such stranger, he paid the note in such a manner as would discharge it, or whether he purchased the same.

We are of the opinion that H. C. Pappas was not an indorser within the meaning of the Negotiable Instrument Law. Before the adoption of that law in this State, one who indorsed commercial paper after it had been put in circulation was not an indorser, but a guarantor. *Killiam* v. *Ashley,* 24 Ark. 511, 91 Am. Dec. 519; *Scanlan* v. *Porter,* 64 Ark. 470, 42 S. W. 897. The adoption of the Negotiable Instrument Law does not, in our opinion, change that rule. Section 7830, C. & M. Digest, prescribes the liability of an irregular indorser; that is, one who, not otherwise a party, places his name upon an instrument, and this indorsement must be before delivery of the paper. The liability of a general indorser is fixed by § 7832, C. & M. Digest, and, under this section, such indorser "engages that, on due presentment, it shall be accepted or paid, or both, as the case may be, according to its tenor," etc. The note being past due at the time H. C. Pappas placed his name upon it, he could not have engaged that, upon due presentment, it would be paid according to its tenor. At that time there could be no due presentment and the note could not be paid "according to its tenor." But, because H. C. Pappas was not an indorser, it does not necessarily follow that he was a stranger to the note. He could, and did, make himself liable thereon to the bank by signing his name thereon and by executing the so-called renewal note. That, in our opinion, under the allegations of the complaint, was a separate and distinct contract, collateral to the original undertaking of the deceased, and sup-

ported by a sufficient consideration—the agreement of the bank temporarily to forego its undoubted right to foreclose its collateral.

It is sometimes hard to say whether a given contract is one of surety or guaranty. The terms are frequently loosely employed by the courts and in the textbooks. There are, however, certain well recognized distinctions between the two relations. The subject was considered by this court in *Hall* v. *Equitable Ins. Co.,* 126 Ark. 535, 191 S. W. 32; *Shores-Mueller Co.* v. *Palmer,* 141 Ark. 64, 216 S. W. 295; *Broomer Lbr. Co.* v. *Hickman,* 71 Ark. 549, 76 S. W. 559; *Wilks* v. *Vaughan,* 73 Ark. 174, 83 S. W. 913. See 28 C. J. 889-894.

But, whether H. C. Pappas was a guarantor or a surety, his right, upon being compelled to pay the note, to be subrogated to the rights of the payee and to receive the collateral, was the same. 37 Cyc. 402.

It is sufficient here for us to say that we believe the contract between the bank and H. C. Pappas, which was undoubtedly made for the benefit of the estate of the deceased, was a contract of guaranty.

We find it unnecessary to pass upon the question as to whether the administrator could consent to H. C. Pappas becoming a guarantor. One who becomes the guarantor of another's contract without the knowledge or consent of such person, and who, by reason of his guaranty, pays the principal creditor, becomes by operation of law the purchaser of the debt, stands in the shoes of the principal creditor, and, as such, is entitled to all collateral. *Leslie* v. *Compton,* 103 Kan. 92, 72 Pac. 1015, L. R. A. (N. S.) 1918F, 706; *Teberg* v. *Swinson,* 32 Kan. 24, 4 Pac. 83; *Carter* v. *Jones,* 40 N. C. (5 Ired. Eq.) 196, 49 Am. Dec. 125; *Wright* v. *Garlinhouse,* 27 Barb. (N. Y.) 474; *Marsh* v. *Hayford,* 80 Me. 97, 13 A. 271; *Hecker* v. *Mahler,* 64 Ohio St. 176, 60 N. E. 555; *Snell* v. *Warner,* 63 Ill. 176; *Peak* v. *Dorwin,* 25 Vt. 28.

It therefore becomes immaterial whether the administrator consented to the contract of guaranty or whether in law he could consent thereto.

The liability of a guarantor is secondary. C. & M. Dig., § 7762; *Crawford* v. *Turnbaugh,* 80 Ohio St. 43, 98 N. E. 858; 2 Daniel, Negotiable Instruments, §§ 1753-1754. It is otherwise with a surety. *Hall* v. *Equitable Ins. Co., supra; Shores-Mueller Co.* v. *Palmer, supra.* As said in the last cited case: "The contract of a surety starts with the agreement, and the liability of a guarantor is established for the first time with the default of the principal debtor."

In this case the act of the appellee bank in taking a new note executed by the appellant personally and by H. C. Pappas, the brother of the deceased, amounted to an extension of the debt. Until this extension note, which was in itself the contract of guaranty, matured, the appellee bank had no right to proceed against the estate of the deceased, nor had it any right to proceed against H. C. Pappas. His guaranty was that the estate of the deceased would pay the note on or before the maturity of his note. There was no liability upon his part to pay until his note matured. If he paid the note prior to that time, his act was tantamount to the act of a stranger, against whom there was no liability. In order that the guarantor may be subrogated to the rights of the creditor, upon paying the debt, the payment must be made at a time when he was legally required to make it. 37 Cyc. 375 *et seq.*; 37 Cyc. 407. The right to subrogation does not exist unless the payment was made by one who at the time was required by law to pay. 5 Pomeroy's Equity Juris., § 2345 *et seq.*; 2 Story's Eq. Juris. (14 ed.), § 717 *et seq.* Of course, if Pappas was not subrogated to the rights of the bank, it was not justified in delivering him the collateral. He was not legally required to pay the note of the deceased until the renewal note which he had executed matured, and if he paid it prior to that time, he will be regarded as a stranger to the debt. *Martin* v. *Monger,* 112 Ark. 394, 166 S. W. 566.

From this view of the law it becomes important to ascertain whether the complaint shows upon its face that,

at the time H. C. Pappas paid the note of the deceased, he was legally required to pay the same—that is to say, that *his* note had matured. If this appears from the complaint, we unhesitatingly say that no cause of action was alleged against the appellee.

We are, however, from a careful examination of the complaint, unable to find any allegations from which a reasonable inference can be drawn that H. C. Pappas paid the note *at a time when he was required to pay it under his contract with the bank.* Indeed, the necessary inferences from the complaint are to the contrary. The complaint does not allege that H. C. Pappas *was required* by the bank to pay the note. On the other hand, it alleges that the appellee *"accepted payment* of its note from H. C. Pappas, the brother of the deceased, and wrongfully delivered at the time to H. C. Pappas the said security," etc. The inference is that the payment by H. C. Pappas was the result of a voluntary act upon his part, one *not* required by his legal obligation. The complaint alleges that the bank *"accepted"* payment, from which we are led to infer that the payment of the note by H. C. Pappas was not the result of his obligation, which might not yet have matured. The allegations as to the estate's insolvency, being referable to the date the complaint was filed (January, 1926) cannot aid us in reaching a conclusion contrary to the one expressed. We are therefore unable to say, from the facts alleged, giving them every possible intendment in favor of the correctness of the lower court's ruling on the demurrer, that it appears with certainty that at the time he paid the note he was legally bound to do so.

If the appellee bank desired to justify its act in delivering the collateral to a guarantor, and the complaint failed to show, as we hold, that at the time of the payment of the note and the delivery of the collateral the guarantor was legally bound and obligated to pay the debt, it should have, by motion in the lower court,

requested that the plaintiff be required to allege the facts with more particularity.

It is earnesly insisted by the appellee that, if Pappas be considered a stranger to the transaction, his payment of the note and the assignment to him thereof, together with the attached collateral, would make him a purchaser of the debt and entitle him to receive the collateral.

It is undoubtedly true, as shown above, that a stranger may purchase negotiable paper either before or after maturity, in which event the paper is not discharged, and he becomes the holder of the same with all the rights of his assignor, including the right to receive such collateral as his assignor may have had. It is also undoubtedly true that, where a stranger pays another's note, he is presumed to have purchased the same, and the note is not discharged. *Chappell* v. *McKeough,* 21 Colo. 275, 40 P. 769; *Bank* v. *Friend,* 80 Mo. App. 657; *Van Standt* v. *Hobbs,* 84 Mo. App. 628; *Ketchum* v. *Duncan,* 96 U. S. 659, 24 L. ed. 868; *Wood* v. *Guaranty Trust Co.,* 128 U. S. 416, 9 S. Ct. 131, 32 L. ed. 472; *Barney* v. *Clark,* 46 N. H. 514; *Dent* v. *Matthews,* 202 Mo. App. 451, 213 S. W. 141; *People's State Bank* v. *Dryden,* 91 Kan. 216, 137 Pac. 928; *McDonald* v. *Burns,* 83 Fed. 866. The last cited case is an opinion by the Circuit Court of Appeals for the Eighth Circuit (judgment was rendered by Sanborn and Thayer, Circuit Judges). See also on this point, 3 Randolph on Commercial Paper, §§ 1438-1440.

An examination of the authorities just cited will disclose the fact that, while the presumption is, as stated above, that the payment of a note by a stranger is a purchase thereof and not a discharge, yet, in the final analysis, it is a question of the intent of the parties, which is to be gathered from all the facts and circumstances. This presumption is not one of law, it is a presumption of fact, and may be rebutted.

In construing the allegations of the complaint with respect to whether or not the act of H. C. Pappas in pay-

ing the note (assuming that he was a stranger in so doing) amounted to a purchase thereof and not a discharge of the paper, we find that the complaint is silent on the question as to whether the original note, or any note, for that matter, was delivered to H. C. Pappas. It does not appear from the complaint whether the note was marked paid by the bank or whether it was delivered to Pappas with the intention and understanding that the note was not being discharged but that the title thereto was merely being transferred to Pappas as a purchaser, together with the collateral, which he was to hold as security for the payment of the note. We cannot say, as a matter of law, and in the teeth of allegations apparently to the contrary, that the payment of the note by H. C. Pappas made him a purchaser thereof, although, when the facts and circumstances are fully shown, such may be the legal effect thereof.

Our statute provides that payment of a note by or on behalf of the maker will discharge it. C. & M. Dig., § 7885. Hence payment of such note by a stranger, if made for and on behalf of the maker, would discharge the debt. If H. C. Pappas paid this note for and on behalf of his brother, the note was discharged, and he was not entitled to the collateral. If, on the other hand, he paid it for and on behalf of himself, with the intention thereby of acquiring title to the note and its attached collateral, the note was not discharged, and the bank was justified in delivering him the collateral.

The complaint might have been fuller on this point, and a motion to make more definite and certain would lie. We cannot say, however, that it was bad upon demurrer, whether H. C. Pappas be treated as a party secondarily liable or as a stranger.

We may add that if H. C. Pappas was a purchaser of the note, or if he paid the same at a time when he was legally required to do so, the case of *Union & Mercantile Trust Co.* v. *Harnwell, supra,* has no application.

From what has been said it follows that the judgment of the lower court is reversed, and the cause remanded with directions to overrule the demurrer and for further proceedings in accordance with law and not inconsistent with this opinion.

Mr. Justice SMITH, Mr. Justice HUMPHREYS and Mr. Justice McHANEY dissent.

Mr. Justice KIRBY did not participate.

### DISSENTING OPINION.

HUMPHREYS, J.    This is an appeal from a judgment dismissing appellant's complaint against appellee upon a failure to amend same, after a demurrer had been sustained thereto upon the ground that it did not state a cause of action.    The complaint, omitting caption, is as follows:

"Comes the plaintiff, Andrew Briscol, and states that M. C. Pappas departed this life on the —— day of ————, 1922, intestate, and that he was appointed administrator of the estate of the said M. C. Pappas on the 7th day of June, 1922, by the probate court of Pulaski County, Arkansas, and duly qualified as such administrator; that at the time the Bank of Commerce & Trust Company was a corporation organized under the laws of the State of Arkansas, and doing a general banking business; that, subsequent to said time, the American Southern Trust Company has become the owner and successor of the American Bank of Commerce & Trust Company, and is and has been, since its succession to the ownership of said American Bank of Commerce & Trust Company, engaged in the banking business in the city of Little Rock, Arkansas. Plaintiff states that, at the time of the death of said M. C. Pappas, the said American Bank of Commerce & Trust Company held a promissory note of said Pappas for the sum of $700, and to secure said note he, the said Pappas, had placed as collateral a certificate of deposit, executed by the Banque Nationale de Greece, which certificate of deposit cost the said M. C. Pappas the sum of $5,000 of American money, and was of that value; said certificate matur-

ing about April, 1924. Plaintiff states that, after the death of the said M. C. Pappas, he, together with the said H. C. Pappas, a brother of deceased, put their indorsement upon said note past due, and also executed a new note individually to cover said loan and to serve as a renewal or continuance of said original note. Plaintiff states that the said American Bank of Commerce & Trust Company failed and refused to·present its debt for allowance by the administrator and to have same probated as the law directs, and that said claim of $700 has never been probated against said estate. Plaintiff states that, some time about the first day of April, 1923, the defendant, or the American Bank of Commerce & Trust Company, of which the defendant is successor, accepted payment of its note from H. C. Pappas, the brother of the deceased, and wrongfully delivered at the time to H. C. Pappas the said security held by it, which was of the value of $5,000, against his directions and over his protest, and refused to deliver same to this plaintiff, upon proper demand made therefor, thus converting said securities unlawfully to its own use. Plaintiff states that there is a large amount of indebtedness against said estate, and that the other property belonging to same is wholly insufficient to pay same indebtedness, and that the said American Bank of Commerce & Trust Company is indebted to him, as administrator, in the sum of $5,000, the value of the said security held and wrongfully converted by the defendant, for his cost, and all proper and general relief.''

Appellant contends for a reversal of the judgment upon the ground that, after maturity of the note and the death of the maker, it ceased to be negotiable, and that the delivery thereof, with collateral attached, to an indorser who paid the note, amounted to a conversion of the collateral, and that appellee is responsible for the value thereof, less the amount of· the note and interest.

The death of the maker and maturity of the note did not render it non-negotiable. The death of a maker

does not affect the negotiability of paper, so far as transferring it is concerned, the only effect being that the assignee takes it after maturity subject to all defects and defenses the maker or prior holders might have. The indorsement of the note by appellant and H. C. Pappas and the execution of a new note by them for the purpose of renewing or continuing the original loan note with collateral attached had no other effect than obtaining an extension of the original note by giving additional security. The complaint does not allege that the new note was given in settlement of the old and that the collateral was released, but, on the contrary, alleges that it was given in continuation or renewal of the old note. The payment of the note by one of the indorsers, and the delivery of the old note with collateral attached, amounted to a transfer of negotiable paper which carried the collateral as an incident, and did not amount to a conversion of the collateral by appellee. The administrator still had and has the right to follow the collateral in the hands of H. C. Pappas, and recover any equity there might be after paying the note. The rule announced is sustained by the following cases: *Bank of Forsyth* v. *Davis*, 113 Ga. 341, 38 S. E. 836, 84 Am. St. Rep. 248; *Goss* v. *Emmerson,* 23 N. H. 38; *Waddle* v. *Owen,* 43 Neb. 489, 61 N. W. 731.

The case of *Union & Mercantile Trust Co.* v. *Harnwell,* 158 Ark. 295, 250 S. W. 321, cited by appellant in support of his contention, is not in point. In that case the collateral was sold contrary to the pledged agreement, and the court ruled that it was an unlawful conversion of the collateral, while in the instant case there was no sale of the collateral at all. The note was assigned to H. C. Pappas by the bank when he paid the debt, and the collateral attached to the note passed to H. C. Pappas as an incident.

Mr. Justice KIRBY not participating.