AMERICAN INSURERS' LIFE INS. CO. *v.*
THE FIRST NAT'L. BANK IN BLYTHEVILLE.

5-2868                                           367 S. W. 2d 97

Opinion delivered April 1, 1963.

[Rehearing denied May 20, 1963.]

*Harry E. Meek,* for appellant.

*Graham Sudbury, Marcus Evrard, Pope, Pratt & Shamburger,* by: Richard L. Pratt and Joseph L. Buffalo, Jr., E. J. Ball, for appellee.

Ed. F. McFADDIN, Associate Justice. This litigation arose by complaint filed by the First National Bank in Blytheville against The American Insurers' Life Insurance Company and also Mrs. Gladys Gill, executrix of the estate of H. Noble Gill, deceased. There were answers, cross-complaints, and interventions by various parties; and a great mass of evidence and exhibits were offered in the trial in the Chancery Court, so that the record now before us is voluminous and the issues are varied. At the outset, we identify the parties:

(a) The First National Bank in Blytheville is a national banking corporation and is hereinafter identified as "Bank."

(b) Mrs. Gladys Gill is the executrix of the estate of H. Noble Gill, who departed this life testate on June 11, 1960, a citizen and resident of Mississippi County, Arkansas.

(c) The American Insurers' Life Insurance Company is an insurance company organized under the laws of Arkansas on the 28th day of February, 1958; and will be hereinafter identified as "American Insurers."

(d) Lester Gill is a brother of H. Noble Gill, deceased.

(e) Other parties, referred to as "Intervenors," were creditors of H. Noble Gill, and are Primrose Oil Company, Blytheville Propane Company, Buchanan Agency, and Marcus Evrard.

This appeal brings into the open some of the tangled affairs of the late H. Noble Gill. He owned interests and

equities in a number of enterprises in Eastern Arkansas, including stock in the Cape County Milling Company of Jackson, Missouri, and in the Dell Compress of Dell, Arkansas; and also lands in Mississippi County, Arkansas, and in the State of Mississippi. Most all of his holdings were encumbered, but the general public thought he had considerable equity. On February 28, 1958, H. Noble Gill organized the "American Insurers"; and transferred to it substantially all of his various holdings and equities for 1,941,468 shares of no par value stock in American Insurers. Among other assets there was the equity of his shares of stock in the Cape County Milling Company held by the Bank. Gill envisaged that he could sell some of his stock in American Insurers[1] to pay the Bank's claim, and also that a large income tax liability would be avoided. For convenience, we list and discuss the controversies between the various litigants.

I. *The Issues Between The Bank And American Insurers.* At all times from August 4, 1956 to his death, H. Noble Gill was indebted to the Bank in large sums of money; and the Bank, along with other security, all the time held for the protection of its loan all of the duly endorsed stock certificates of H. Noble Gill in the Cape County Milling Company. These certificates totalled three-fourths of all the preferred and common stock of said company. On May 4, 1959, H. Noble Gill, to evidence accumulated indebtedness, executed a note to the Bank for $60,000.00, secured by all of his stock certificates in the Cape County Milling Company held by the Bank. There was also other security not necessary to be described. This $60,000.00 note was reduced by payments, so that at the time of Gill's death the balance due the Bank was $30,000.00 and interest; and on September 7, 1960, the Bank filed this suit.

The American Insurers claimed title to the certificates free of the claim of the Bank because (a) H. Noble Gill executed a "Transfer of Stock"[2] to American Insurers on February 28, 1958; (b) the Bank (acting by its Vice

---

[1] With the exception of one block of 30,000 shares, all the other 225 persons who purchased stock in American Insurers purchased the H. Noble Gill shares.

364

President Reese) informed American Insurers on February 28, 1958 that on payment of $74,000.00 the certificates would be delivered to American Insurers; and (c) American Insurers (by Mr. Butler) paid the Bank the $74,000.00. The Chancery decree awarded relief to the Bank; and against that decree American Insurers prosecutes this appeal.

We conclude that the decree, in favor of the Bank, was correct in awarding it a prior claim on the Cape County Milling Company stock. We begin with the thoroughly established fact that H. Noble Gill's stock certificates in Cape County Milling Company were endorsed by him and pledged to the Bank as security for his then or thereafter indebtedness to the Bank.[3] Furthermore, the Bank has completely established the amount of the indebtedness of H. Noble Gill to the Bank. So the Bank has made a complete case for itself, unless and until the American Insurers as the adverse claimant can disprove or rebut the Bank's claim.

The claim of American Insurers was really estoppel: that is, American Insurers claimed that the representative of the Bank told it that for $74,000.00 the Bank would release the H. Noble Gill stock certificates in Cape County Milling Company held by the Bank; and American Insurers paid the $74,000.00. The American Insurers had the burden of proving such estoppel (*Watson* v. *Murray,* 54 Ark. 499, 16 S. W. 293); and the Chancellor, who saw the witnesses, held that the evidence was not sufficient to sustain American Insurers on this point. We rest our affirmance on the delay and laches of American Insurers. The alleged representation by Mr. Reese was on February 28, 1958. In March 1958 American Insurers learned—as it admitted[4]—that the Bank would not deliver the stock

---

[2] This instrument is copied in toto in Topic IV of this opinion.

[3] The wording of the pledge is an broad as can be imagined. A portion of the wording is mentioned in Topic II *infra.*

[4] Mr. Butler testified that his check to the Bank was dated March 17, 1958; that a few days later H. Noble Gill delivered to Butler for American Insurers the notes of Gill and the assignment from the Bank; that Butler called Reese at the Bank and was advised that the Bank had credited the $74,000.00 on the said notes, and would not surrender the shares of stock in Cape County Milling Company until additional amounts were paid; so American Insurers learned of all of this in March 1958.

certificates. Instead of demanding a return of the $74,-000.00, American Insurers kept the notes and the assignment tendered by the Bank, as tantamount to a novation.

The American Insurers never returned the notes and assignment to the Bank; so from March 1958 to and including the trial below, American Insurers kept what the Bank tendered in lieu of the Cape County Milling Company stock certificates. From March 1958 until American Insurers filed its first pleading in this case on September 23, 1960, American Insurers never asked any court to require the Bank to surrender the Cape County Milling Company stock certificates free of the claim of the Bank. In the interval from March 1958 to September 1960, Mr. Reese, the Vice President of the Bank and the person alleged by American Insurers to have made the $74,000.00 representation, has died. H. Noble Gill, who is alleged to have heard the $74,000.00 representation, has died. There was thus a delay of two years and six months by American Insurers after it had full notice of the Bank's refusal; and during that time many, many events have happened which have materially changed the situation of the litigants from that existing in March 1958. American Insurers was the delaying party. It took the chance that H. Noble Gill would make a success of his insurance venture. American Insurers cannot "have its cake and eat it also." This is a clear case of loss of a claim by laches. See *Walker* v. *Norton,* 199 Ark. 593, 135 S. W. 2d 315; and *Falls* v. *Jackson,* 205 Ark. 435, 186 S. W. 2d 787. We affirm the Chancery decree in favor of the Bank on the Cape County Milling Company stock certificates.

II. *The Issues Between Lester Gill and American Insurers.* On February 7, 1957, the indebtedness of H. Noble Gill to the Bank had become so large that it was in excess of the aggregate amount of credit that the Bank could extend to one individual (that is, it was in excess of $60,000.00); so on the date mentioned Lester Gill, as a favor to his brother, H. Noble Gill, and at the request of

the Bank, executed a note to the Bank for $25,000.00, signed by Lester Gill. H. Noble Gill gave his personal note to Lester Gill for $25,000.00, which was endorsed and was also held by the Bank; and Lester Gill claimed that the Bank agreed that he would be subrogated to the security of the Cape County Milling Company stock certificates held by the Bank. Lester Gill intervened in this litigation to have his indebtedness paid out of any excess of the proceeds of said security after the Bank had been paid; and the Bank acquiesced in such intervention. American Insurers resisted the claim of Lester Gill.

In addition to its claim for all the stock certificates of Gill, as previously discussed, American Insurers further claimed: (a) that on February 28, 1958 H. Noble Gill executed a "Transfer of Stock" [5] to it, whereby American Insurers became entitled to all the stock certificates of H. Noble Gill held by the Bank; (b) that the pledge instrument held by the Bank would not cover the Lester Gill claim; and (c) that the claim of subrogation was a mere afterthought.

The Chancery decree was in favor of Lester Gill's claim; and a careful study convinces us that the decree in favor of Lester Gill was correct. It was clearly established that Lester Gill's note was credited as a payment on H. Noble Gill's indebtedness to the Bank; that H. Noble Gill's note to Lester Gill was held by the Bank as collateral of the Lester Gill note; and that the loan agreement of H. Noble Gill to the Bank covering pledge of collateral covered any and all direct, indirect, absolute, or contingent liabilities of H. Noble Gill to the Bank, as well as any "endorsement, draft, bill of exchange, note, guarantee, letter of credit, or other obligation, or in any other manner." Furthermore, there was positive testimony of the express representations of the Bank officials to Lester Gill that he would be subrogated to the Bank's security.

The Chancellor saw the witnesses and heard them testify and believed their testimony; and we cannot say that the Chancellor's findings on this issue are against

---

[5] This instrument is copied in toto in Topic IV of this opinion.

the preponderance of the evidence. So we affirm the decree in favor of Lester Gill for subrogation. See *Talbot v. Wilkins,* 31 Ark. 411; and *Briscol* v. *American Southern Trust Co.,* 176 Ark. 401, 4 S. W. 2d 912.

III. *Amounts Received by American Insurers From Cape County Milling Company.* It was shown that the Cape County Milling Company paid to American Insurers, or paid to others for its use and benefit, the total sum of $21,572.07. These payments were because American Insurers assumed control of Cape County Milling Company after February 28, 1958; and this amount of $21,572.07 was claimed by American Insurers as "dividends." American Insurers had acquired from another party the certificates for one-fourth of the common and preferred stock in Cape County Milling Company, and was entitled to actually receive only one-fourth of the $21,572.07; so in fact received an excess of $16,790.05. If the sale of the Cape County Milling Company stock fails to bring enough to satisfy the judgment of the Bank and Lester Gill, judgment shall then go against American Insurers and in favor of the Bank and/or Lester Gill for the deficit, up to the $16,-790.05, being three-fourths of the amount received by American Insurers from Cape County Milling Company.

IV. *The Issues Between American Insurers and Mrs. Gladys Gill, Executrix of the Estate of H. Noble Gill, Deceased.* The Chancery Court found and decreed that the American Insurers had no valid claim to the stock of H. Noble Gill in the Cape County Milling Company that was pledged to the Bank; that the "transfer instrument" relied on by American Insurers was ineffectual; and that the Estate of H. Noble Gill should receive any and all proceeds from the sale of the pledged Cape County Milling Company stock above what was necessary to pay the Bank and Lester Gill. The American Insurers has appealed from such decree in favor of Mrs. Gill, Executrix; and we conclude that the Chancery Court was in error in the decree in favor of Mrs. Gill, as executrix, as against the American Insurers.

The American Insurers' Life Insurance Company was organized on February 28, 1958, in Little Rock, Ar-

kansas; and H. Noble Gill was the moving spirit in the said organization. Among other incorporators, there were W. H. Patton, an accountant, and E. J. Butler, an attorney. The plan of H. Noble Gill was to organize the American Insurers' Life Insurance Company, to transfer to it substantially all of his various holdings and equities for no par value stock in American Insurers; and then to sell some of the said stock without incurring any large income tax liability. Gill did transfer to American Insurers by deed all of his equity in 2,000 acres of land in Mississippi County, Arkansas, 5,500 acres in the State of Mississippi, and certain other assets; for all such transferred and attempted transferred assets Gill received, either outright or in escrow, a total of 1,941,468 shares of no par value stock in American Insurers.

Among other stocks which H. Noble Gill attempted to transfer to American Insurers was his stock in the Cape County Milling Company, but this stock was pledged to the Bank, as previously mentioned, and Gill was unable to obtain the release of the stock from the pledge. When the final date arrived for Gill to transfer his holdings to the American Insurers for the said no par value stock, he informed his fellow incorporators that his stock in the Cape County Milling Company (he owned three-fourths of the total stock) was pledged to the First National Bank in Blytheville and he would have to transfer the stock subject to the claim of the Bank. There was insistence that the insurance organization be immediately completed and the charter issued that day, so E. J. Butler, as the organizing attorney of American Insurers, prepared this instrument, which H. Noble Gill executed:

## "TRANSFER OF STOCK

"THIS WRITING WITNESSETH: That I, H. Noble Gill, of Blytheville, Arkansas, have on this twenty-eighth day of February, 1958, and by this instrument do on this date, bargain, sell, transfer, assign and set over unto the American Insurers' Life Insurance Company, Little Rock, Arkansas, 4,023 shares of the capital stock of the Cape County Milling Company, Jackson, Missouri, said shares being represented by Cape County Milling

Company Stock Certificate[6] Numbers 61, 62, 63, and 66 and in consideration therefor, I have received from American Insurers' Life Insurance Company of Little Rock, Arkansas, 450,023 shares of the no par capital stock of said Insurance Company.

"I hereby warrant to American Insurers' Life Insurance Company, Little Rock, Arkansas, that the value of the Cape County Milling Company stock is $450,028.84 based on appraised values of The Lloyd Thomas Company, Chicago, Illinois, and I at this time leave up with American Insurers' Life Insurance Company 438,608 shares of its stock in escrow to guarantee the value of the Cape County Milling Company stock, which is hereby transferred to said Insurance Company, and I do hereby irrevocably approve, constitute and appoint Tull Johnson my attorney to transfer the said Cape County Milling Company stock on the books of the said corporation with full power of substitution in the premises.

"WITNESS my hand on the date and year hereinbefore first written.

"/s/ H. Noble Gill

"Witnessed by /s/ E. J. Butler."

We have held in Topics I and II, *supra*, that the Bank, as the holder of the stock certificates, had a superior claim for itself and for Lester Gill; and we now hold that the instrument entitled "Transfer of Stock" was effectual and valid as between H. Noble Gill and American Insurers to transfer his remaining interest in the pledged stock to American Insurers. Section 64-310 Ark. Stats. is Section 10 of the Uniform Stock Transfer Act, and reads:

"An attempted transfer of title to a certificate or to shares represented thereby without delivery of the certificate shall have the effect of a promise to transfer and the obligation, if any, imposed by such promise shall

---

[6] The fact that the numbers on the stock certificates differ is immaterial.

be determined by the law governing the formation and performance of contracts.''[7]

When H. Noble Gill signed the instrument entitled ''Transfer of Stock'' and delivered the real estate deeds to American Insurers, he received a total of 1,941,468 shares of no par value stock in American Insurers. The fact that he left 750,000 shares in escrow does not alter the fact that he received consideration for the transfer. On the strength of the signed instrument, $74,000.00 was paid by American Insurers to the Bank, as heretofore detailed. If H. Noble Gill were living to-day, he could not avoid his obligations and liabilities under the Transfer of Stock instrument. It is true that the executrix of an estate occupies the double role of being not only the person representing the decedent, but also the representative of creditors, legatees, etc. (*Hobbs v. Cobb,* 232 Ark. 594, 339 S. W. 2d 318); but Mrs. Gill, as executrix of the estate, stands in this case in the same position as H. Noble Gill would stand if he were alive and before the Court on the contract here involved. In 21 Am. Jur. 583, ''Executors and Administrators'' § 337, in discussing the contracts of the decedent, the holdings of the various jurisdictions are summarized in this language: ''Generally, all contractual obligations which survive the death of the obligor are binding on his executors and administrators in their representative capacity and may be enforced against his estate to the extent of the assets thereof, subject, of course, to all proper grounds of defense.''

The executrix claims that American Insurers has really disaffirmed the entire transfer of assets by Gill to American Insurers because it filed an instrument declaring the values as represented by Gill to be excessive. But that instrument did not amount to a disaffirmance

---

[7] For some cases from other jurisdictions involving this section, see *Parsons v. Lipe,* 286 N. Y. Supp. 60, 200 N. E. 31; *Whitney v. Nolan* (Mass.), 6 N. E. 2d 386; *Johnson v. Johnson* (Mass.), 13 N. E. 2d 788; *Lockhart v. Dickey* (La.), 108 So. 483; *Estate of Ezra Connell* (Pa.), 128 A. 503, 38 A. L. R. 1362; *Salmon v. Moore* (Miss.), 118 So. 2d 867. While not directly in point, we call attention to the following as persuasive: *Aycock v. Bottoms,* 201 Ark. 104, 144 S. W. 2d 43; and *Leonard v. Taylor,* 183 Ark. 933. 39 S. W. 2d 704.

of the conveyance: rather, it was an affirmance of the contract and a claim of breach of warranty.

The executrix, by cross-complaint against American Insurers, sought to recover the equity of H. Noble Gill in the stock certificates here involved. On such cross-complaint the executrix had a burden of proof which was not discharged. So we reverse all that part of the Chancery decree in favor of the executrix and against American Insurers.

V. *The Issues Between The Intervenors And American Insurers.* The intervenors were creditors of H. Noble Gill, with claims filed and allowed against his estate, and some, if not all, of these intervenors were creditors of Gill before he made the transfer of his assets to American Insurers. The germane allegations of the interventions were: (a) that the Cape County Milling Company stock pledged to the Bank was worth in excess of $200,-000.00; (b) that the instrument entitled "Transfer of Stock" was of no effect; (c) that stock was not issued and delivered to Gill by American Insurers for the Cape County Milling Company stock; and (d) that the purported transfer of the Cape County Milling Company stock by Gill to American Insurers was a fraudulent conveyance. The Chancery decree awarded relief to Mrs. Gill as executrix and thereby afforded relief to the intervenors.[8] Since we have reversed the decree awarding relief to Mrs. Gill as executrix, it becomes necessary to consider whether the intervenors have established any right to relief as against American Insurers, the transferee from Gill, even assuming each of the intervenors

[8] The Chancery decree contains this language: "e. If the 'Transfer of Stock' instrument were definite and certain in its terms and if the estate of H. Noble Gill were barred by estoppel from claiming title and ownership in said stock, such transfer would be void even as against the estate inasmuch as possession of the Cape County Milling Company stock did not accompany such instrument; no good consideration was received by Gill, and the transfer would have, in fact, delayed and hindered the collection of debts by creditors of Gill, from which the Court must presume the intent to hinder and delay creditors. Ark. Stats. Sec. 68-1302, Sec. 68-1304. . . . "(7) The Court concludes that the creditors intervening have sought the basic relief that the stock above described be declared the property of the estate of H. Noble Gill, deceased, which the Court has done, and no further relief or conclusions need be made relative thereto."

to have been a creditor of H. Noble Gill prior to the transfer to American Insurers on February 28, 1958.

When we sustained the ''Transfer of Stock'' instrument against Mrs. Gill, executrix (as we did in Topic IV, *supra*), we disposed of the claims of the intervenors as to the effectiveness of such instrument; so we pass to the other claims, as heretofore listed. The actual value on February 28, 1958 of the Cape County Milling Company stock pledged to the Bank is a matter of uncertainty. The value was materially increased by the death of H. Noble Gill, because the Cape County Milling Company collected approximately $100,000.00 on a life insurance policy it carried on his life. But for the purposes of this decision, we may assume the total value of the pledged stock to have been $200,000.00 on February 28, 1958. American Insurers issued to H. Noble Gill a total of 450,028 shares of its no par value stock for *all* of the shares of preferred and common stock in Cape County Milling Company. One fourth of the total shares of said preferred and common stock were owned by Tull Johnson unpledged, and he endorsed and delivered his certificates to American Insurers and in return therefore H. Noble Gill delivered to Tull Johnson 30,000 shares of Gill's stock in American Insurers. Some of these shares delivered to Johnson came from unpledged shares of H. Noble Gill because he left 438,608 shares in escrow with American Insurers to guarantee the warranty of clear title of the shares pledged to the Bank. The fact that Gill left part of the shares in escrow to guarantee the warranty did not alter the fact that American Insurers had issued the shares to Gill.

The fact that stock issued by American Insurers to Gill had some value at the time of issuance is amply attested by the record: E. J. Butler paid Gill $25,000.00 in cash for 25,000 shares; and W. H. Patton paid Gill $40,000.00 for 40,000 shares. Gill sold stock to a number of people for $1.00 per share; Gill was able to borrow $93,000.00 from a large bank here in Arkansas on the pledge of some of his shares of stock in American Insurers; and shortly before his death Gill was in the process of organizing a sales campaign, to sell some of

his shares in American Insurers at $3.00 per share. If the stock Gill received from American Insurers was not worth $1.00 per share, it was because Gill had overvalued his own assets; and if that be true, his creditors were in no worse position after the stock deal than they were before the stock deal. The value of Gill's estate in 1960 is not the test of the value of the stock he received in 1958. The evidence is entirely insufficient to afford the intervenors any relief on the theory of a fraudulent conveyance under § 68-1302 *et seq.* Ark. Stats.

After exploring the entire record we reach the conclusion that the intervenors, as creditors of H. Noble Gill, have established no rights in excess of the rights asserted by Mrs. Gill as executrix, and the interventions should have been dismissed for want of equity.

VI. *Rulings As To Evidence.* In various instances some of the parties to this appeal have complained of the rulings of the Chancery Court, either for admitting, or refusing to admit, tendered evidence. We have not ignored these contentions: rather, we have considered proffered evidence which we found should have been admitted and have disregarded improper evidence against which proper and timely objections were made. It would unduly prolong this opinion and serve no useful purpose to discuss all of these instances. We merely mention them so that no one will think the contentions have been overlooked.

### CONCLUSION

The Chancery decree is affirmed in part and reversed in part, all as herein stated; and the cause is remanded to the Chancery Court for further proceedings not inconsistent with this opinion; the costs of this appeal are to be borne equally by American Insurers and the executrix of the estate of H. Noble Gill.

HARRIS, C. J. and JOHNSON, J., dissent in part.

CARLETON HARRIS, Chief Justice (dissenting in part). I disagree with those portions of the opinion which hold:

(1)  that the bank holds a first lien on the Cape County Milling Company stock;

(2)  that Lester Gill has a lien on the Cape County stock.

Testimony on the part of appellant reflects that E. J. Butler, Secretary of the insurance company, contacted A. B. Reese, a vice-president of the First National Bank in Blytheville, for the purpose of determining the amount of payment that would be required by the bank before the latter released Noble Gill's Cape County Milling Company stock. Butler stated that Reese advised that a payment of $74,000 would release the stock, together with a lien on certain real estate in Mississippi County. Since about $80,000 had been raised through the sale of Noble Gill's insurance shares, Butler, around the middle of March, and in reliance upon Reese's statement, sent $74,000 to the bank. This remittance was represented by a $67,000 cashier's check and Butler's personal check on his special account for $7,000. While the method of payment[1] is not established, it is undisputed that the $67,000 cashier's check was payable to Butler, *as Trustee,* and endorsed by him in that capacity. The $7,000 check was signed by Butler and drawn on "E. J. Butler Special Account." After cashing these remittances, Reese sent Butler two promissory notes and a junior mortgage (which were of no value to the company as far as I can see), each instrument being assigned by the bank, to E. J. Butler. This would certainly indicate that Reese knew that someone other than Noble Gill had a beneficial interest in these funds.

The related facts are not commented upon by the majority, so I take it that there is no finding that Butler

---

[1] It was never established whether Butler sent these checks through the mail with a letter of transmittal, or whether the checks were taken and delivered to Reese, personally, by Noble Gill. Butler's office had been destroyed by fire, and many records were burned.

did not communicate with Reese and obtain the assurances that he testified to. The majority opinion on this point is predicated on the delay and laches of American Insurers, *i.e.,* the return of the $74,000 was not demanded, and for two and one-half years, the insurance company took no action to enforce its claim to the stock.

Let it be borne in mind that Noble Gill, as the founder and president of the company, actually had charge of the operations and the failure of the company to make demand was apparently because of the fact that Gill did not desire to do so. It would appear that Gill continued to receive personal advancements from the bank on the basis of the fact that the latter was holding the stock, but Gill, having assigned this stock to the insurance company, was in no position to use it for personal purposes.

It is difficult for me to understand why Reese, or other bank officials, would not have known that the stock had been assigned by Noble Gill to the insurance company, inasmuch as brochures announcing this fact had been circulated widely in Eastern Arkansas.[2] This testimony incidentally, was not admitted, not considered by the trial court, (nor mentioned by this court) and I consider it competent and relevant evidence, and quite pertinent to the issue of whether the bank knew that someone else was making a claim to the stock.

It appears to me that the bank applied Butler's remittance, either according to its own wishes, or according to the wishes of Gill, whereas, according to the testimony of Butler, the bank, through its vice-president, had knowledge that the money was sent for the purpose of acquiring the milling stock.

In fact, it can hardly be disputed that the bank, somewhere along the way, acquired knowledge of the stock transfer since, in filing its suit against the Gill estate to foreclose its alleged lien on the stock, the insur-

---

[2] Butler testified that he personally gave Reese a copy of the brochure which stated that the Cape County stock had been transferred to American Insurers' Co.—though this was subsequent to the $74,000 transaction.

ance company was made a party defendant under the following allegation:

"The plaintiff has been informed, and therefore alleges, that prior to his death the said H. Noble Gill entered into an agreement by which he transferred all of his rights in the shares of corporate stock that have been mentioned herein, subject to the right of this plaintiff therein, to the defendant, American Insurers' Life Insurance Company."

If it developed that Mr. Reese underestimated the amount necessary to pay the bank's lien on the Cape County stock, it is apparent to me that subsequent payments were more than adequate to cover the indebtedness. On the basis of the testimony of E. M. Regenold, President of the bank, it would appear that on the date the Butler remittance was applied by Reese, the Cape County stock was encumbered to the extent of $98,551.41; therefore, the estimate of Reese would have been short in the amount of $24,551.41. But it is admitted by the bank in its complaint that it had subsequently made collections totaling $29,687.11 on the balance of the indebtedness secured by the stock. It appears to me that the instant suit by the bank was predicated on additional advances made to Gill against the stock *after* the bank became apprised of the insurance company's interest in such stock. A study of the liability ledger sheet shows that as of September 19, 1959, (which was more than a year after Butler protested to Reese that the $74,000 had been misapplied), Noble Gill's debt had gone up to $65,200, including an obligation of $5,200, represented by a demand note which was an entirely new loan. Riley Jones, a vice-president of the bank, testified that in July, 1958, Gill's debt was increased from $30,450 to $60,000.

While, as stated, I disagree with the majority holding as heretofore set out, I do recognize that, because of the failure of the insurance company to take steps to enforce its rights, there is something to be said for the view taken by the court majority. However, I much more strongly disagree with the court's holding that Lester Gill is entitled to a lien on the Cape County stock.

Aside from the fact that I feel that the bank had notice that Noble Gill had previously assigned the stock to the insurance company, I cannot see how Lester Gill, under the facts and circumstances herein, is entitled to such a lien. This transaction took place on February 25, 1957. Let it be borne in mind that Noble Gill did not receive one dime by virtue of the note executed from Lester Gill to the bank; he had already obtained his statutory limit from the bank (then $60,000), and the note given by Lester Gill was *entirely for the benefit of the bank*. Here again the transaction was handled for the bank by Mr. Reese, and according to Lester Gill, "Mr. Reese told me the bank was in the process of helping Noble with some refinancing, but that his line of credit had been exceeded; that the bank was expecting examiners and that the matter of Noble's account had to be straightened up before they could further proceed."

I do not understand how the bank could create a lien on Noble Gill's stock for the benefit of Lester; in my view, some overt act on the part of Noble Gill would have been required, and no such overt act appears in the record. Noble Gill gave to Lester his note to cover the $25,000, *but this note was unsecured*. To me, the facts set forth in the preceding paragraph preclude any lien on the stock in favor of Lester Gill; in addition, further actions of the bank indicate that that institution did not consider that Noble Gill's note to Lester was secured by the Cape County stock for,

(1)  The bank sued Lester on February 3, 1961, in Circuit Court, asking judgment against Lester, *but asking no lien on* the Cape County stock.

(2)  The bank filed the suit here on appeal to foreclose a lien on the Cape County stock, but in this suit it made no claim that it held an additional lien on the stock arising out of the Lester Gill transaction.

(3)  The bank's liability ledger sheet, covering Lester's borrowings, does not reveal the alleged lien.

The majority is relying upon the "anaconda"[3] mortgage executed by Noble Gill. I cannot agree that this instrument lends any weight to the contentions made by appellee, Lester Gill. In the first place, the instrument was not signed by Noble Gill; rather, it was signed by O. E. Hunnicutt, acting as attorney-in-fact, and Hunnicutt, in affixing his signature purportedly acts on behalf of the "Gill Gin Company" and "H. Noble Gill," the company and Gill being joint signers. I think, under a proper interpretation, the instrument would apply only to such line of credit as the bank might extend to Gill Gin Company and Noble Gill, *as joint obligors*.

In addition, I feel that the majority has reached a strained construction of this document when they hold that the stock securing Noble Gill's original loan would also secure a subsequent note of Noble Gill's which the payee (Lester Gill) merely hypothecated to the bank.

Lester Gill testified that (at the time of the trial) he had in his possession 10,000 shares (2,000 of which he held as trustee for his two sons) of the insurance company stock, which he had received from Noble Gill. When asked if the 10,000 shares were given to him in payment of the obligation that was due him from his brother, he replied, "It was not mentioned to me by him." He then stated he had helped Noble financially at prior times, and that on a previous occasion he had loaned $25,000, and had been given 2,000 shares of American Insurers' stock by Noble, who said, "Here is what you bought." He testified that the insurance company stock was not issued to him in connection with this particular loan, but he stated that he did not know why the note given to him by Noble did not provide that it was secured by the Cape County stock. Finally, the transcript reveals that the cross-examination of Lester Gill concluded as follows:

"Q. Do you have any record of these loans that you stated a while ago you previously made to Noble for which the American Insurers' stock was issued to you?

[3] So characterized by this court in *Fuller* v. *Berger*, 180 Ark. 372, 21 S. W. 24 419.

A. American Insurers' Insurance Company stock was not issued to me in connection with this loan.

Q. I say, do you have any record of the other loans you made to him for which you say this stock was issued?"

A. I didn't say the stock was issued in connection with any loan.

Q. Do you say he gave it to you?

A. He handed it to me and said, 'This is what you bought.' I did not know I was going to receive it and didn't want it.

Q. Was it for the $25,000.00 note?

A. There was not anything mentioned."

Irrespective of the significance of this testimony, I feel, for the reasons set forth in the preceding paragraphs, that Lester Gill is not entitled to a lien on the Cape County stock.

I am authorized to state that Mr. Justice JOHNSON joins in this dissent.